Sharon PILCHER, et al., Plaintiffs,

v.

DIRECT EQUITY LENDING, f/k/a National Equity Corp., et al., Defendants.

Rex Oliver Fair, et al., Plaintiffs,

v.

National Equity Corp., Defendant.

Brian W. Christiansen, et al., Plaintiffs,

v.

National Equity Corp., Defendant.

Nos. 99–1245–JTM, 99–2446–JTM, 99–2447–JTM.

United States District Court, D. Kansas.

Feb. 27, 2002.

Mark B. Hutton, Derek S. Casey, J. Darin Hayes, Deborah B. McIlhenny, Hutton & Hutton, Larry D. Toomey, Toomey, Pilgreen & Hayes, LLC, Christopher P. Christian, Wichita, KS, for Plaintiffs.

Todd W. Ruskamp, Shook, Hardy & Babon, L.L.P., Kansas City, MO, J. Eugene Balloun, Scott C. Nehrbass, Gregory T. Wolf, David A. Rameden, Shook, Hardy & Bacon L.L.P., Overland Park, KS, Gregory B. Hancks, Leslie A. Greathouse, Kutak Rock LLP, Kansas City, MO, James M. Armstrong, Foulston & Siefkin L.L.P., Wichita, KS, Patrick J. McLaughlin, Dorsey & Whitney, LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

Currently before the court in this action by various consumers claiming that second mortgages violated provisions of the Kansas Uniform Consumer Credit Code (U3C) are motions for summary judgment by the plaintiff consumers seeking a determination of liability by defendants. In addition, one group of defendants has moved to dismiss the charges against them and/or in the alternative for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Evidence before the court permits the following findings of fact. To the extent requested findings of fact are not supported with admissible evidence or are not relevant to the issues before the court, those requested findings are not included herein.

Plaintiffs Sharon Jean Pilcher and Cloyd Justin ("C.J." or "Ace") Pilcher are mar-

ried and reside at 14711 Fifty–Ninth Street South, Derby, Kansas. Mrs. Pilcher has a degree from Cowley County Community College in business manufacturing and applied science. Mrs. Pilcher has been employed by The Boeing Company since March 7, 1986 in inspection, fiberglass lay-up and composite lay-up. Mr. Pilcher also holds a degree in business manufacturing and applied science from Cowley County Community College. He is also employed at The Boeing Company, working in quality assurance, as a router operator, and as an investigator. Prior to his employment with Boeing, Mr. Pilcher worked in quality assurance with The Coleman Company.

In 1997, the Pilchers were experiencing financial problems. Mrs. Pilcher had been laid off from 1995 to 1997. The Pilchers owed credit card debts. However, they were continuing to make their payments and were not behind on payments at that time. The Pilchers also needed financing to complete some remodeling on their home and build a garage. After they received a mailed advertisement from National Equity Corporation ("NEC"), Mrs. Pilcher discussed the advertisement with Mr. Pilcher and then contacted NEC pursuant to the advertisement. As a result of that and two other telephone calls, NEC approved Mr. and Mrs. Pilcher for a second mortgage loan. During the third telephone call, NEC told Mrs. Pilcher that they would "send a representative" to her house to complete the loan transaction.

On June 20, 1997, Mr. and Mrs. Pilcher executed a loan secured by a second mortgage on their home with defendant NEC. Mr. and Mrs. Pilcher executed the loan and mortgage in their home in Derby, Kansas. After executing the documents, the notary selected by NEC left with the original loan documents.

The Pilchers borrowed $65,000. The interest rate on the note was 14.99%. To obtain the loan, NEC assessed the Pilchers a loan origination fee ($6,500), a loan discount charge ($150), a processing fee ($250), a title examination fee ($120), a document processing fee ($150) and a government recording charge ($40). The monthly loan payments, over the life of the loan, total $249,597.77. Since June of 1997, the Pilchers have paid $39,937.92 on their second mortgage loan. They refinanced this loan in June 2001.

Plaintiff Donald G. Smith resides at 3520 West 19th Street in Wichita, Kansas. He graduated from Wichita North High in 1974. Since high school, Mr. Smith has been employed by the Associated Company, Inc., as a Vice President of Engineering & Manufacturing, and as a Fabrication Foreman with H & R Parts Co., Inc., in Wichita.

Smith contacted NEC by telephone after receiving a solicitation by mail. In the spring of 1997, Mr. Smith was contacted by two individuals from NEC to process his loan. He obtained the loan to consolidate personal debts.

A notary came to his home in Wichita to execute the loan documents. On April 1, 1997, Smith executed a loan secured by a second mortgage on his residence with NEC. The notary took the signed, original loan documents with him.

Smith borrowed $35,000. The interest rate on the note was 14.5%. To obtain the loan, NEC assessed a $3,500 loan origination fee, a $250 processing fee, a $100 title examination fee, and a $35 government recording fee. The monthly loan payments, over the life of the loan, total $107,518.91.

Since April 1, 1997, Smith has paid $24,192.00 on the loan.

Plaintiff Albert Stanley Abraham resides at 2633 South Santa Fe, Wichita, Kansas. Mr. Abraham has a degree in

electrical engineering technology from Wichita State University. Mr. Abraham has been employed at The Boeing Company in avionics engineering for 20 years.

He received a mailed advertisement from NEC about debt consolidation, and contacted them in early April 1997. He was interested in a loan to consolidate personal credit card debts and to remodel his basement. After a couple of telephone calls, Abraham met with a notary at the Southern Pines Restaurant, located at 2806 South Hydraulic in Wichita, who brought the loan documents for Mr. Abraham's signature. Abraham executed the loan on April 8, 1997, secured by a second mortgage on his home with defendant NEC. The notary left the restaurant with the original, executed loan documents.

Abraham borrowed $38,000.00. The interest rate on the note executed was 12.5%. To obtain the loan, NEC assessed Abraham a loan origination fee ($3,800), a loan processing fee ($250), a title examination fee ($100), a document processing fee ($150) and government recording charges ($35). The monthly loan payments, over the life loan, total $103,618.81. Since April 28, 1997, Abraham has paid $24,266.71 on the loan.

Plaintiff Andre P. Guillory resides at 150 Peachwood Drive in Haysville, Kansas, with his wife, plaintiff Brenda Guillory. They have seven children. Mr. Guillory holds a degree in ·industrial technology from Wichita State University, and works at Kansas Gas Service in Wichita supervising the installation of gas and electric meters.

Mr. Guillory received a mail solicitation from defendant NEC in 1997. He contacted NEC about a debt consolidation loan. After several telephone conversations and an application, defendant NEC approved the Guillorys for a second mortgage loan, which they used to consolidate personal debts.

A notary selected by NEC brought the loan papers to the Guillory home in Haysville, Kansas. The Guillorys executed a loan secured by a second mortgage on their residence. After signing, the notary took the original, signed loan documents with her.

The Guillorys borrowed $50,000. The interest rate on the note was 14.99%. To obtain the loan, NEC assessed a $5000 loan origination fee, a $250 processing fee, a $100 title examination fee, a $150 document preparation fee, and a $35 government recording charges fee. The monthly loan payments, over the life of the loan, total $192,000. The Guillorys have paid $25,091.26 on the loan.

Plaintiffs Brian and Stacey Christiansen (on June 19, 1997), Lewis Tyler, Jr. and Terry Lynn Tyler (on May 21, 1997), and Rex Oliver Fair and Angela Sue Fair (on October 27, 2001) also obtained loans through NEC. This group of plaintiffs contends that the loans were illegal under the Kansas U3C because the loans charged interest in excess of 12 % and were made by an unsupervised lender. The group also makes additional complaints of illegality with respect to these loans which are discussed below.

NEC was started by Kerry Smith in October 1995 in Costa Mesa, California. Smith was the President of NEC from 1995 to 1998. NEC's purpose was to provide mortgage loans and second trust deeds for California residents. Around 1996, NEC began to do business in other states. In 1998, NEC ceased to do business following an asset sale to another company.

During its three years of operation, NEC provided loans underwritten by FirstPlus Financial. To locate potential borrowers, NEC bought lists of homeowners' names for direct mail advertisements. NEC then used direct mail adver-

tising to solicit its business. When NEC received a loan application from a potential borrower, it compared the application to its underwriting parameters provided by FirstPlus. If the application met these parameters, the loan would be "preapproved" by FirstPlus. Once approved, NEC would send loan documents to a notary who would take them to the borrower for closing. Smith described this process in his deposition: "The notary takes the loan documents over to the borrower. The borrower signs the documents. The notary Fed Exs the conditions and the documents back to us." (Smith dep. at 46:18–24). NEC then arranged and delivered the documents to its buyer, FirstPlus. The loan was then funded and the money sent to the borrower.

In 1996, NEC contacted the Office of the State Bank Commissioner of the State of Kansas to obtain an application to do business in Kansas. There is a factual dispute as to the nature of Smith's contacts.

The plaintiffs contend that NEC, which charged its customers interest in excess of 12% and was thus obliged under Kansas law to qualify as a "supervised lender," failed to correctly identify its intentions. In support of their contention, plaintiffs point to a statement by the staff counsel for the Office of the State Bank Commissioner, Sonya Allen. According to Allen, it was the position of the Commissioner's office that the lender was responsible for determining its own status under Kansas law, that the Commissioner's office did not dispense legal advice regarding appropriate licensing, and that, if any prospective lender had indicated an intent to charge interest in excess of 12%, the lender would have been referred to the Office of the Consumer Credit Commissioner rather than directly issuing a Mortgage Business Act License. Plaintiffs also point to a number of statements made by Kerry Smith during his deposition, in which he indicates uncertainty as to what he actually told the Bank Commissioner's office.

Against this, Smith states in an affidavit that while he could not be entirely certain of what he told the Commissioner's office, he had no intention to conceal any information regarding NEC's practices. He states that it was the practice of NEC, in obtaining licenses to do business outside of California, to reveal the range of interest rates that it intended to charge, and that there is no reason he would not have acted consistent with this policy in his dealings with the Kansas Bank Commissioner. Such full disclosure, he contends, would have been consistent with NEC's general practices.

With respect to Allen's statement, it must be recognized that she is not testifying with any personal knowledge as to Smith's communications with the Bank Commissioner's office; she is simply testifying as to what her understanding is as to how the personnel in the office ought to have responded. Accordingly, the court is presented with a dispute of fact in which each side is primarily supported not by direct evidence, but by inferences based upon the recommended or general practices of the Bank Commissioner and NEC. This dispute must be resolved by the trier of fact.

In 1996, the Office of the State Bank Commissioner regulated certain aspects of the mortgage business in Kansas. The State Bank Commissioner did not regulate businesses licensed by the Kansas Consumer Credit Commissioner as a supervised lender pursuant to K.S.A. 16a–2–301.

On October 18, 1996, the State of Kansas Office of the State Bank Commissioner issued a "Certificate of Registration" to NEC, Certificate Number 96–116. The Certificate was re-issued on September 11, 1997.

At sometime prior to February 28, 1997, NEC requested a supervised lender's license from the State of South Carolina.

Debra S. Richardson is a financial examiner for the Office of the State Bank Commissioner, State of Kansas. She was a Public Service Administrator for the Office of the Consumer Credit Commissioner. Her duties during that time included all matters regarding licensing under the Consumer Credit Code. According to Richardson, NEC never obtained a license from the Office of the Consumer Credit Commissioner to issue supervised loans in 1996 or 1997.

The second mortgage loans on the Guilory, Pilcher, and Abraham residences are held by defendant FirstPlus Home Loan Owner Trust 1997–3. The second mortgage on the Smith residence is held by defendant FirstPlus Home Loan Owner Trust 1997–2.

U.S. Bank National Association (formerly known as First Bank National Association) is the Co–Owner Trustee and Indenture Trustee of the Assignee Trusts.

The defendant Assignee Trusts were formed and created under the terms of those certain Trust Agreements among FirstPlus Investment Corporation (referred to as Depositor), FirstPlus Residual Holdings, Inc. (as the Company), Wilmington Trust Company (as Owner Trustee), and First Bank National Association (as Co–Owner Trustee), dated as of June 1, 1997, and September 1, 1997. The two Trust Agreements are referred to respectively as the "1997–2 Trust Agreement" and the "1997–3 Trust Agreement." The Trust Agreements appointed Wilmington Trust Company as the Owner Trustee of the Trusts, and First Bank National Association as Co–Owner Trustee.

The Assignee Trusts hold second mortgage loans, receive income from the second mortgage loans, distribute the payments received from the Servicer to holders of notes and certificates of beneficial interest in the Assignee Trusts, and issue certificates and notes under the terms of Indenture of Trusts. In this role, the Assignee Trusts issued notes under the terms of those certain Indentures between the Assignee Trusts, as issuer, and U.S. Bank National Association, as Indenture Trustee. Under these indentures, all of the payments from the Assignee Trusts are pledged to the Indenture Trustee to secure the Assignee Trusts' obligations under the Indentures.

Section 2.9 of the 1997–2 Trust Agreement and Section 2.09 of the 1997–3 Trust Agreement establish the Trusts as Delaware Business Trusts located and administered in the State of Delaware. The Trust Agreements also provide that the only office of the Assignee Trusts shall be in the care of the Owner Trustee at the Corporate Trust Office, which is defined as the principal Corporate Trust Office of Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware. The Assignee Trusts maintain no offices in Kansas.

The Trust Agreements also provide that all bank accounts maintained by the Owner Trustee on behalf of the Assignee Trusts must be located in the State of Delaware or the State of New York, except with respect to the Co–Owner Trustee. Payments into the Assignee Trusts are to be received by the Assignee Trusts only in Delaware or New York and payments made by the Trusts are made only from Delaware or New York except with respect to the Co–Owner Trustee. U.S. Bank, as Co–Owner Trustee, may maintain accounts for the Assignee Trusts in St. Paul, Minnesota.

The Trust Agreements provide that the Assignee Trusts shall have no employees. The plaintiffs respond to this fact by stressing that, while the Trusts have no

explicit employees, they have general power under the Trust Agreements to accomplish the purpose of the Trusts, that the Trusts are empowered to contract with other persons to fulfill these goals, and that the Trusts have the ability to use a Servicer to perform various tasks relating to the underlying Notes and Mortgages. However, the servicing agreements in question explicitly provide for administration by the servicing agent as "an independent contractor," and the service agent is precluded from acting as "a joint venturer, agent or partner" of the Trusts. (Sales and Servicing Agreements, § 9.05) It is uncontroverted that the Assignee Trusts have no employees or agents in Kansas, and that no employee or agent of the Assignee Trusts have traveled to Kansas on behalf of the Assignee Trusts.

The Assignee Trusts are limited to certain specified activities. These are the only activities in which the Assignee Trusts are expressly authorized to engage.

The Assignee Trusts engage in no business in Kansas and have no officers, employees, agents or representatives located in the State of Kansas.

The Assignee Trusts do not own, lease or use real estate in the State of Kansas, except in connection with its ownership of second mortgage notes. The prospectuses under which investment securities in the Assignee Trusts were sold indicate that, for the 1997–2 Trust, a total of 18,554 loans were assigned to the Trust. Of these, 151 (less than 1 percent of the total) were secured by real property in Kansas. For the 1997–3 Trust, the prospectus indicates that 20,759 loans were assigned to the Assignee Trust. Of these, 270 (1.3 percent) were secured by real property in Kansas.

The Assignee Trusts have not transacted business within the State of Kansas, have not made contracts within the State of Kansas, have not solicited either the plaintiffs or solicited other second mortgage loans in the State of Kansas, and have not entered into second mortgage loans in the State of Kansas. The Assignee Trusts have not loaned money to Plaintiffs.

The mortgage loans held by the Assignee Trusts were transferred and assigned to the Assignee Trusts under the terms and conditions of a Sales and Servicing Agreement dated as of June 1, 1997 (for Trust 1997–2) and a Sales and Servicing Agreement dated as of September 1, 1997 (for Trust 1997–3). At the time of the assignment, the Servicer under the terms of the Sales and Servicing Agreements was FirstPlus Financial, Inc. FirstPlus Financial later transferred its servicing rights and responsibilities to Western Interstate Bank, which in turn transferred its servicing rights and responsibilities to Countrywide Home Loans, Inc., the present Servicer of the loans.

The Servicer services the loans under the provisions of Article IV of the Sales and Servicing Agreements. Section 4.01(a) of the Agreements afford the Servicer the "full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable." The Servicer is expressly directed "to collect all payments called for under the terms and provisions of each Home Loan" § 4.01(c). If any home loan is in default, the Servicer is authorized to "collect or liquidate such Home Loan in default" and empowered to "foreclose or otherwise comparably effect ownership in such mortgage property." § 4.02(a).

The Assignee Trusts derive all of their power and authority from the Trust Agreements under which they were created. Section 2.3 of the 1997–2 Trust Agreement and Section 2.03 of the 1997–3 Trust Agreement delineates all of the activities

in which the Assignee Trusts are expressly authorized to engage. Those activities do not include the direct collection of mortgage loans or the direct enforcement of rights under mortgages.

The Assignee Trusts have not directly collected payments from obligors of second mortgage loans in the State of Kansas. The Assignee Trusts have not directly collected payments, fees or commissions from plaintiffs in connection with the loans extended to them that are the subject of this suit. The Assignee Trusts have not collected fees and commissions from Kansas consumers with respect to second mortgage loans in the State of Kansas. The Assignee Trusts, for good and valuable consideration, acquired and hold notes secured by second deeds of trusts or mortgages encumbering real estate in Kansas and other states, including the notes of the plaintiffs in this action. The notes are endorsed payable to the order of the Assignee Trusts by previous holders of the notes. Physical custody of the notes are with Bank One in Houston, Texas. Bank One acts as custodian of the notes pursuant to agreements with the Trusts and for the account of the Assignee Trusts.

The mortgage notes are presently serviced by Countrywide Home Loans, Inc., at its offices in Calabasas, California. Countrywide submits statements to the makers or obligors of the notes and the makers or obligors of the notes make the payments called for by notes to Countrywide at Countrywide's California offices.

In accordance with the pledge of all Assignee Trust payments in the Indentures, Countrywide remits all payments of principal and interest collected on the second mortgage notes held by the Assignee Trusts to U.S. Bank, as Indenture Trustee, at U.S. Bank's offices in St. Paul, Minnesota.

The Assignee Trusts do not undertake direct collection of payments from or direct enforcement of rights against consumers arising from second mortgage loans.

It is uncontroverted that the Assignee Trusts took assignment of the notes at issue in this action (1) for value in the form of cash payments, (2) in good faith and with honesty in fact, (3) without notice that the notes were overdue or had been dishonored or that there were any incurred defaults with respect to payment, (4) without notice that the notes contain an unauthorized signature or had been altered, (5) without notice of any claims of property or possession rights in the notes or their proceeds, and (6) without notice that any party had a defense or claim in recoupment. It is also uncontroverted that the transferors represented and warranted (in § 3.03(e) of the Sales and Servicing Agreements) that none of the notes transferred were subject to any claim, setoff, counterclaim, or defense, and that all loans complied with all applicable laws including, without limitation, consumer protection laws.

## Conclusions of Law

The core of the plaintiffs' case rests on Section 2–301 of the U3C (KSA 16a–2–301), which provides:

Unless a person is a supervised financial organization; or has first obtained a license from the administrator authorizing such person to make supervised loans; or is the federal deposit insurance corporation acting in its corporate capacity or as receiver, such person shall not engage in the business of

(1) making supervised loans; or

(2) taking assignments of and undertaking direct collection of payments from or enforcement of rights against debtors arising from supervised loans, but such person may collect and enforce for three months without a license if the person promptly applies for a license and such person's application has not

been denied. Nothing in this section shall be construed to require the licensing of an attorney who is forwarded contracts for collection.

Remedies for violations of Section 2–301 are addressed by KSA 16a–5–201(2). This statute provides:

> If a creditor has violated the provisions of this act applying to authority to make supervised loans (section 16a–2–301), the loan is void and the consumer is not obligated to pay either the amount financed or finance charge. If the consumer has paid any part of the amount financed or of the finance charge, the consumer has a right to recover the payment from the person violating this act or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt. With respect to violations arising from loans made pursuant to open end credit, no action pursuant to this subsection may be brought more than two years after the violation occurred. With respect to violations arising from other loans, no action pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement pursuant to which the charge was paid. Persons subject to the penalties in this subsection shall not include attorneys or collection agencies who do not purchase a consumer obligation.

Kansas Comment 3 to this provision in the UCCC states:

> Subsection (2) describes the remedy available to the consumer when a loan with an annual percentage rate exceeding 12% is made by a person not authorized to make such a loan. The remedy is to void the transaction and allow the consumer to retain the proceeds. In *United Kansas Bank & Trust v. Rixner*, 4 Kan.App.2d 662, 610 P.2d 116, *aff'd* 228 Kan. 633, 619 P.2d 1156 (1980), this

remedy was applied against a state-chartered bank that made a loan at a rate above 18% without the benefit of a supervised lender's license. However, the result in that case has, in effect, been overruled by federal legislation. See the Kansas comment to K.S.A. 16a–2–301. While the penalty itself was not changed, legislation adopted in 1999 may have the effect of increasing the frequency with which it is applied, particularly to out-of-state lenders whose only contact with Kansas is that the consumer resides here. See Kansas comment 2 to K.S.A. 16a–1–201. Attorneys or collection agencies who enter the picture by merely attempting to collect the obligation are exempt from liability under this section, which is aimed at the lender only.

The official comment to Section 2–301 also explicitly recognizes the "severe penalty of KSA 16a–5–201(2), forfeiture of the entire loan proceeds." KSA 16a–2–301, Kansas Comment 1995, § 2. In *United Kansas Bank & Trust Co. v. Rixner*, 228 Kan. 633, 619 P.2d 1156 (1980), the court dealt with an alleged violation of KSA 16a–2–301. The court affirmed the decision of the district court which "voided the agreement." 228 Kan. at 633, 619 P.2d 1156. It also reversed the district court's decision refusing to grant the return of payments made on the loan. That result, the court wrote, "is required by express statutory provisions." *Id.* at 634, 619 P.2d 1156. Justice Holmes, joined by three other justices, concurred that the court had "no other option than to follow the statutes as written" but, noting the windfall resulting to plaintiff, expressed concern that the statute "produces a result which is not conducive to respect and confidence in the laws under which our society must function." *Id.* at 635, 619 P.2d 1156 (Holmes, J., concurring).

 The court finds that summary judgment in favor of plaintiffs to their claims of violation of Section 2–301 by NEC is inappropriate in light of the evidence before the court. Material questions of fact exist with respect to two issues. First, whether NEC is entitled to the good faith defense accorded by KSA 16a–5–201(7). Under this provision, a creditor is entitled to protection from liability, and the validity of the loan is preserved, if the violation of Section 2–301 "is unintentional or the result of a bona fide error of law or fact notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation or error." Because the application of this affirmative defense requires inferences as to intent, inferences drawn from conflicting testimony as to what Smith may or may not have done in his contacts with the State Bank Commissioner's office, summary judgment is inappropriate. *See Rea v. Wichita Mortgage Corp.,* 747 F.2d 567 (10th Cir.1984). In addition, a question of fact remains whether the Kansas U3C applies to these transactions. Under KSA 16a–1–201, a consumer transaction is made in this state if the creditor engaged in face-to-face solicitation in Kansas, or if "[a] signed writing evidencing the obligation or offer of the consumer is received by the creditor in this state." [1] Because substantial questions remain [2] as to the process by which the executed loan documents were forwarded by the notaries to NEC, the court cannot state beyond a reasonable doubt at this time that the documents were received in Kansas.

 In addition to the claims of violation of Section 2–301 of the Uniform Consumer Credit Code, the Fair, Christiansen and Tyler plaintiffs complain that the notes executed are illegal in that they (1) violate the maximum permitted interest rates allowed by KSA 16–207(b); (2) instituted excessive origination fees; (3) are unconscionable in their inclusion of a penalty provision in the event of prepayment; and (4) are illegal in their inclusion of a waiver of the right of redemption "if allowed by law."

The cited grounds do not provide a basis for summary judgment. Section 16–207(b) by its express terms applies only to first mortgages, not (as here) second mortgages. According to the evidence submitted by NEC, excessive origination fees were refunded to plaintiffs. With respect to the prepayment penalty, KSA 16a–2–509 does provide that a consumer may prepay a loan in full without penalty. However, the evidence submitted by NEC indicates that

---

**1.** The 1995 Kansas Comment to the version of the statute in existence at the times the challenged loans were made, observes that, under Subsection 1,

> the issue of whether the transaction will be deemed to have been made in Kansas (triggering application of the entire U3C) is dependent on factors within the creditor's control, such as the place at which the executed contract is received and whether any face-to-face solicitations occur in Kansas. As a result, creditors have a measure of control over the applicability of the U3C with respect to disclosure requirements and can arrange their interstate operations in a manner that minimizes the operational difficulties arising from the variations in the disclosure requirements of the laws of different states. This flexibility on the part of creditors with respect to the applicability of the disclosure provisions offers no threat to consumers because the [Federal Consumer Credit Protection Act, 15 U.S.C. § 1601] assures consumers that disclosure requirements will be substantially similar in all states.

In 1999, the state legislature amended KSA 16a–1–201(1) to substantially expand the "solicitation" prong to many acts beyond face-to-face contacts.

**2.** These include the identity of the notaries, the process by which they were selected, and what instructions they were given as to the handling of the documents.

plaintiffs alternatively did not attempt to prepay the loans, which were subsequently discharged in bankruptcy, or that the notes in question do not include such a provision. Finally, while KSA 60–2414 preserves the right of redemption on a single family residence, this does not mean that a general provision in loan documents agreeing to such a waiver "if allowed by law" is automatically a violation of law.

On the latter point, plaintiffs' reliance on *Halloran v. North Plaza State Bank*, 17 Kan.App.2d 840, 844 P.2d 764 (1993) is inapposite. In that case, a provision which would grant attorney fees against the consumer "if permitted" was deemed a violation of consumer credit protection law. However, the court's decision was expressly grounded on the specific language of KSA 16a–2–507; the court wrote that the defendant's argument that the provision was a nullity rather than a violation "ignores the unqualified nature of the prohibition contained in 16a–2–507. The statute includes no exceptions as it states that an agreement may *not* provide for attorney fees." 17 Kan.App.2d at 842, 844 P.2d 764. Unlike the statute in question in *Halloran*, KSA 60–2414 merely provides, indirectly, that an agreement waiving the right of redemption is without effect; there is no positive provision outlawing such language.[3]

█ Turning to the various motions as they relate to the Trust defendants, the court will deny plaintiffs' motions for summary judgment against the Trusts, and grant the Trusts' motion for summary judgment. First, the court finds it is without jurisdiction to hear the claims advanced against the Trusts. In reaching this conclusion, the court agrees with the conclusions limiting the exercise of juris-

diction over nonresident assignees in *Barry v. Mortgage Servicing Acquisition Corp.*, 909 F.Supp. 65 (D.R.I.1995) and *Rogers v. 5–Star Management, Inc.*, 946 F.Supp. 907 (D.N.M.1996).

Here, it is uncontroverted the Trusts have no employees in Kansas. There is no allegation of wrongdoing by the Trusts in Kansas. The challenged loans were made in Kansas, but not by the Trusts. Those loans were acquired by the Trusts, not from NEC but from FirstPlus. The loans were acquired as a package, and represent approximately one percent of the nationwide collection of second mortgages held by the Trust defendants. Pursuant to the Servicing Agreements, a Servicer performs some nationwide processing actions on the loans, but the uncontroverted evidence is that the Servicer is an independent contractor, the Trusts do not control or direct the Servicer in its operations.

The Trusts did not directly solicit, negotiate, or contract with the plaintiffs. Although the Trusts hold an equitable interest in Kansas real estate, it is uncontroverted that the Trusts have not attempted to foreclose any liens on Kansas property. Further, the essence of the plaintiffs' case is not the lien the Trusts hold on Kansas real property, but the allegedly illegal interest and fees charged in connection with the challenged loans.

There is no evidence that the Trusts ever intended to purposefully avail themselves of the privilege of transacting business in Kansas, such that they might reasonably anticipate being haled into court here. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Given the totality of the circumstances of the case,

---

**3.** KSA 16a–2–507 was subsequently modified by the legislature to reverse the decision in *Halloran*. The current official Kansas Comment to this section observes that case was "widely criticized" and placed Kansas "seriously out of step with other states (both those with the U3C and those with other forms of consumer credit laws)."

the court finds no basis under which it can exercise jurisdiction over the Trusts pursuant to KSA 60–308(b) in a manner which would be consistent with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■ Independently, the court finds summary judgment with respect to the Trust defendants is appropriate because the Trusts are holders in due course of the challenged notes. The plaintiffs present no substantial response to the Trusts' claim of holder in due course status, other than to contend that the Trusts cannot take the notes free from the underlying illegality, because the loans are under the express terms of the KSA 16a–5–201(2) "void."

■ The court must disagree. "The word 'void' is used in statutes in the sense of utterly void so as to be incapable of ratification, and also in the sense of voidable and resort must be had to the rules of construction in many cases to determine in which sense the Legislature intended to use it." *Black's Law Dictionary*, at 1411 (5th ed., 1979). The need for clarification has been recognized by the Kansas Supreme Court. In *Gorham State Bank v. Sellens*, 244 Kan. 688, 691–92, 772 P.2d 793 (1989) the court noted that the Kansas statute of frauds, which provided that fraudulent conveyances "shall be deemed utterly void and of no effect" in fact meant that "the conveyance is void only as to the equitable title and merely voidable as to the legal title." "A void act has no legal force or effect. A voidable act is not void in itself but may be declared void usually at the option of an affected party." *Lawless v. Cedar Vale Regional Hosp.*, 252 Kan. 1064, 1070, 850 P.2d 795 (1993). In *Regency Park, L.P. v. City of Topeka*, 267 Kan. 465, 981 P.2d 256 (1999) (concluding that a city's collections and disbursements of storm water utility charges were merely voidable), the court distinguished between "void" and "voidable":

> The distinction between actions void and voidable was pointed out in *Frazier v. Jeakins*, 64 Kan. 615, 626, 68 P. 24 (1902), where we cited *Ewell v. Daggs*, 108 U.S. 143, 150, 2 S.Ct. 408, 27 L.Ed. 682 (1883), which stated:
>
>> A distinction is made between acts which are *mala in se* which are generally regarded as absolutely void, in the sense that no right or claim can be derived from them; and acts which are *mala prohibita*, which are void or voidable, according to the nature and effect of the act prohibited.

The court finds that under KSA 16a–5–201(2) an unsupervised loan in violation of KSA 16a–2–301 is voidable rather than void. The statutes do not take the approach that loans charging an interest in excess of 12 percent are *per se* improper in all instances. Rather the approach of the statutes is simply to require licensing and supervision of such loans. Further, even where an unsupervised, high interest loan is advanced, the Code provides various exceptions to liability. For example, an unsupervised loan is not rendered invalid, even if the creditor violates the terms of KSA 16a–2–301, if the creditor made a good faith error regarding the loan. *See* 16a–5–201(7). And, as discussed below, the remedies provided by the Code are also restricted when the loan is assigned to a party who does not directly pursue collection or enforcement of the loan. Such limitations are inconsistent with a view of unsupervised as automatically void *ab initio*. Given these limitations, the court finds that the legislature intended that unsupervised loans in violation of KSA 16a–2–301 are voidable rather than void. Ac-

cordingly, the Trusts may enforce the notes consistent with and pursuant to KSA 16a–3–404 and KSA 84–3–305(a)(2).

■ Next, the court finds that the Trust defendants are entitled to the good faith defense provided by KSA 16a–5–201(7). This section provides a defense in the event a creditor obtains a supervised loan which would violate the terms of the Code, but does so in good faith and despite the institution of procedures to avoid such violations. Here, the uncontroverted evidence establishes that the Trusts required warranties from FirstPlus that the loans in question met all applicable legal requirements. There is no evidence suggesting that the Trusts' acquisition of the loans was in anything other than good faith. The court concludes that the defense in Subsection 7 is available to the Trusts, and is applicable here.

Finally, the court finds that the Trust defendants are entitled to summary judgment because the serious penalties attached to KSA 16a–5–201(2) are limited in the event the assignee does not directly collect the debt or directly enforce it. The statute provides that in the event of a violation of KSA 16a–2–301, "the consumer has a right to recover the payment from the person violating this act or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." As the court noted in its earlier order in the case which permitted plaintiffs to advance their KSA 16a–2–301 claim, the plaintiffs would be required to prove, with respect to the Trust defendants, that those defendants undertook the direct collection of payments or enforcement of rights.

Plaintiffs have failed to meet this requirement. Although plaintiffs attempt to point to the actions of the Servicer in processing payments on the loans, it is uncontroverted that the Servicer acts as an independent contractor, free from the management or control of the Trusts. The means by which the Trusts receive payments on the challenged loans represent what can only be described as an indirect process for the receipt of income on the loans. The plaintiffs' approach, seeking to impose liability under these facts, would essentially require the court to amend the statute to exclude the final clause which imposes liability only on those assignees "who undertake[ ] direct collection of payments or enforcement of rights."

Further, although the text of the statute itself gives the indirectly-collecting assignee a defense only against a consumer claim for repayment of recover payments made on the loan, the court must conclude from the statutory scheme that the defense also bars a challenge to the validity of the loans. To hold otherwise would create the perverse result that the most aggrieved consumers (those who have fully paid off their unsupervised loans) would have far less protection than consumers who have yet to even begin paying off the unsupervised loans.

IT IS ACCORDINGLY ORDERED this _____ day of February, 2002, that plaintiffs' Motions for Summary Judgment in Case Nos. 99–1245 (Dkt. No. 194), 99–2446 (Dkt. No. 20), and 99–2447 (Dkt. No. 18) are hereby denied; defendant Trusts' Motion to Dismiss and for Summary Judgment in Case No. 99–1245 (Dkt. No. 196) is granted.

Pursuant to correspondence submitted by the parties on February 15, 2002, the court hereby extends the deadline for the witness and exhibit exchange to March 1, 2002.