# IN THE SUPREME COURT OF IOWA

No. 12–1708

Filed January 10, 2014

**A. DAVID OSTREM, SR.,**

Appellant,

vs.

**PRIDECO SECURE LOAN FUND, LP,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

Ostrem, an Iowa resident, appeals from a district court decision which granted PrideCo's motion to dismiss for lack of personal jurisdiction. **REVERSED AND REMANDED.**

William B. Ortman (until withdrawal), Mark E. Weinhardt, Danielle M. Shelton, P. Gail Brashers-Krug, and Todd M. Lantz of Weinhardt & Logan, P.C., Des Moines, for appellant.

Todd A. Strother and Bradley M. Beaman of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

**ZAGER, Justice**.

In this case we are asked to decide an issue of first impression involving personal jurisdiction. Specifically, we must determine whether for purposes of obtaining personal jurisdiction over a party, a contractual assignor's contacts with the State of Iowa should be imputed to its assignee for claims relating to the contract. For the reasons set forth below, we hold that an assignor's contacts with the State of Iowa are not automatically imputed to the assignee for purposes of obtaining personal jurisdiction over the assignee. However, we hold that this assignee is subject to personal jurisdiction in Iowa based on its own contacts with this forum through the contractual relationships it assumed by the assignment. We also decline to affirm the district court on alternative grounds. Therefore, we reverse the district court and remand for further proceedings.

## I. Background Facts and Proceedings.

A. David Ostrem, Sr. (Ostrem) resides in Iowa and Florida during parts of each year. Although Ostrem currently spends more time in Florida than in Iowa, he resided in Iowa when the parties allegedly formed the contract at issue in this case.

In 2006, Ostrem learned of a product called no-cost life insurance. Under such an arrangement, a third-party lender finances the premiums for the no-cost life insurance policy. The insured bears no responsibility for the premiums or the loan; the loan is repaid from the death benefit, with the remainder paid to the designated beneficiary. Ostrem asked his son, A. David Ostrem, Jr. (David), an insurance agent associated with AIP Group-IA, LLC (AIP) in Iowa, to obtain a no-cost insurance policy on Ostrem's life. David enlisted the help of Richard Kobernusz (Kobernusz), an insurance broker associated with AIP in Iowa.

Ostrem wanted no-cost life insurance. From the first time Ostrem worked with David and Kobernusz, Ostrem told the two he did not want to pay premiums or assume responsibility for a loan. David and Kobernusz contacted Finance for Life, LLC (Finance for Life), which was based in Tennessee, for help finding a lender to finance the premiums.

David and Kobernusz submitted life insurance applications to several insurance carriers. They submitted an application in Iowa to Indianapolis Life Insurance Company, which was later acquired by Aviva USA Corporation (Aviva). In March 2007, Aviva preliminarily approved Ostrem's application. Finance for Life then arranged for Imperial Premium Finance, LLC (Imperial), a Florida company, to finance the premiums once Aviva approved the policy. Because of the financing arrangement, however, Aviva ultimately rejected the first insurance application.

During August and September 2007, there were email communications among Finance for Life, Imperial, and David and Kobernusz, who were in Iowa, regarding the insurance policy and finance arrangement. Eventually, David and Kobernusz submitted a second application to Aviva. Although they still planned to use Imperial to finance the insurance premiums, David and Kobernusz did not disclose this to Aviva, representing instead that Ostrem would personally pay the insurance premiums. Ostrem had no knowledge of this false statement. Although Imperial knew that Aviva would not approve a policy supported by financed premiums, Imperial assured Kobernusz it would not disclose its involvement in this transaction to Aviva. With the understanding the premiums would not be financed, Aviva issued a $10 million life insurance policy on Ostrem.

Ostrem established the A. David Ostrem Sr. 2007 Irrevocable Trust in September 2007. This Georgia trust was created to own the life insurance policy on Ostrem's life and to pay the premiums for this policy. Imperial loaned money to the trust, and the trust used the loaned money to pay the life insurance premiums. Ostrem's wife, Mary Ann C. Ostrem (Mrs. Ostrem), who had an Iowa address and presumably was also an Iowa resident, served as a cotrustee. To serve as the other cotrustee, Imperial recommended James R. Kelley, a Georgia-based certified public accountant unknown to Ostrem. Kobernusz approved Kelley's appointment as cotrustee without Ostrem's knowledge or approval.

On or around September 14, 2007, James R. Kelley and Mrs. Ostrem, as cotrustees, executed the loan application and agreement, the promissory note, and other closing documents on behalf of the trust. Also on September 14, 2007, as part of the closing documents, Ostrem executed a personal guaranty for the benefit of Imperial. Under the terms of the personal guaranty, Ostrem took responsibility for the loan in the event the trust defaulted on its obligations under the "credit agreement" or the "Secured Promissory Note." The closing documents do not include documents entitled "credit agreement" or "Secured Promissory Note." While Ostrem does not dispute that he may have executed the personal guaranty, he did not thoroughly examine the documents and did not realize he had signed a personal guaranty. Many of the closing documents select Iowa as the forum for any disputes. The personal guaranty, however, selects Georgia as the nonexclusive forum for disputes concerning the guaranty.

On September 26, 2007, Imperial began paying the life insurance premiums by loaning money to the trust.[1] These advances continued for three additional years. On or about October 15, 2010, Imperial assigned its interest in the premium financing arrangement to PrideCo Secure Loan Fund, LP (PrideCo). PrideCo was aware of the premium financing arrangement prior to the assignment. Beginning in May 2009, PrideCo loaned money to Imperial to continue funding insurance premiums through the trust. A PrideCo employee later acknowledged that PrideCo had been involved in the financial transactions from 2007.

PrideCo is a limited partnership with its principal place of business in California. PrideCo has never been licensed to do business in Iowa; it has never been registered with the Iowa Secretary of State; and it has never had an agent for service of process in this state. PrideCo has never had any place of business or office in Iowa; it has never owned, rented, leased, or occupied any real estate in Iowa; and it has never had an Iowa phone number or listed a phone number in any Iowa telephone directory. Its representatives do not reside in Iowa, they do not travel in Iowa for business purposes, and they have not traveled to Iowa in relation to this dispute or any transaction underlying this dispute. PrideCo has never performed services or shipped goods in this state, and it never has had any interest in any trust administered in Iowa. It has never had a bank account or property in Iowa, nor has it owed or paid any taxes in this state. PrideCo has no affiliations with any entity located or incorporated in Iowa. PrideCo has not committed nor has it ever been accused of committing any torts in Iowa. It has never made or performed any other

---

[1] On October 26, 2007, Imperial assigned part of its interest to Sovereign Life Financing, LLC. For purposes of clarity, "Imperial" will refer to both Imperial and Sovereign Life Financing, LLC.

contracts substantially connected with Iowa. Other than the personal guaranty at issue in this case, executed by Ostrem for the benefit of Imperial and assigned to PrideCo, it has no contracts with any person or entity in Iowa.

On June 10, 2011, PrideCo sent Ostrem an update on the loan. This update included a copy of the personal guaranty. It was by receipt of this update that Ostrem first learned about the personal guaranty, and that PrideCo may be looking to him to satisfy the outstanding loans.

Also in June 2011, Brandon Small, a Fund Manager for PrideCo, and David spoke over the telephone about the assignment and other matters related to the loan agreement and the insurance policy. In September 2011, Small contacted Aviva regarding the life insurance policy. To continue concealing from Aviva the premium financing arrangement, Small falsely told Aviva he was calling from the office of cotrustee James R. Kelley.

On December 9, 2011, PrideCo explicitly informed Ostrem it would seek funds from Ostrem personally if the trust defaulted on its payment obligations. On December 19, 2011, Ostrem filed a petition for declaratory judgment in Iowa on the personal guaranty. Ostrem claimed the personal guaranty refers to nonexistent documents, and therefore, it is not a valid contract. Ostrem claimed that if the contract is valid, PrideCo cannot enforce it under the doctrine of in pari delicto. Ostrem also sought rescission based on an alleged civil conspiracy, and he claims Kobernusz and AIP committed negligent misrepresentation, fraudulent misrepresentation, professional negligence, and breach of fiduciary duty. Later, Kobernusz and AIP filed a cross-petition against PrideCo seeking indemnity and contribution from PrideCo.

In January 2012, PrideCo filed a complaint in Georgia state court. Ostrem's defenses in that case are essentially identical to his claims in this case. The Georgia case was removed to federal court, but subsequently remanded on a finding of lack of diversity.

On January 26, 2012, PrideCo filed a motion to dismiss Ostrem's claims. On February 24, PrideCo moved to dismiss the cross-petitions of Kobernusz and AIP. In both motions, PrideCo argued the Iowa district court lacked personal jurisdiction because PrideCo lacks sufficient minimum contacts with Iowa. Alternatively, PrideCo argued that Ostrem, Kobernusz, and AIP failed to state claims on which relief could be granted. Ostrem, Kobernusz and AIP resisted.

After a hearing, the district court granted PrideCo's motion to dismiss for lack of personal jurisdiction. The district court reasoned that because due process requires an individual evaluation of a defendant's contacts with the forum state for purposes of personal jurisdiction analysis, the contacts of Imperial, the assignor, do not impute to PrideCo, the assignee. The court also determined that PrideCo's preassignment knowledge of the financing arrangement, PrideCo's loan of money to Imperial that Imperial subsequently loaned to the trust to pay the insurance premiums, and PrideCo's acceptance in the assignment of Imperial's interest in the financing transaction were individual activities not directed at residents of Iowa. Rather, the district court found that PrideCo's activities were directed toward Imperial in another state.

The district court did rule that Small's call to Aviva in which he misrepresented his identity was related to Ostrem's cause of action. However, Ostrem's claimed harm did not arise from this contact with Aviva because the insurance premium financing transaction, from which this dispute arose, occurred years before. So too with Small's

communications with Ostrem, Kobernusz, and David discussing the validity of the personal guaranty. Ostrem's alleged harm arose from the premium financing agreement with Imperial, not Small's inquiries on behalf of PrideCo after the assignment.

The district court also viewed the financing documents, in particular the personal guaranty from which this dispute arose, as not supportive of personal jurisdiction in Iowa. The other financing documents designate Iowa as the forum for disputes. When Ostrem executed the personal guaranty, however, he consented to the jurisdiction of Georgia's courts for enforcement of the personal guaranty. PrideCo, the court found, would anticipate litigation concerning the personal guaranty in Georgia, not Iowa.

The district court found that PrideCo had virtually no contacts with Iowa. Taking an assignment of a personal guaranty executed in Iowa by an Iowan, coupled with PrideCo's discussions with Iowans regarding the personal guaranty, were not sufficient to support personal jurisdiction over PrideCo in Iowa, particularly in light of the Georgia nonexclusive forum selection clause of the personal guaranty. PrideCo's telephone and email contacts with Iowa also were not sufficient to extend jurisdiction over the company.

Moreover, the district court concluded, this case did not arise from PrideCo's contacts with Iowa. This case rather arose from the contacts of another party, Imperial. The district court refused to impute the contacts of Imperial (the assignor), to PrideCo (the assignee). Because the district court found that it lacked personal jurisdiction over PrideCo,

it did not reach PrideCo's motion to dismiss for failure to state a claim or Ostrem's two motions.[2]

Ostrem appealed the dismissal, and we retained the appeal.

**II. Standard of Review.**

"We review a district court's decision on a motion to dismiss for lack of personal jurisdiction for correction of errors at law." *Shams v. Hassan*, 829 N.W.2d 848, 853 (Iowa 2013). When deciding whether it has personal jurisdiction over a defendant, the district court must make factual findings. *Id.* If those findings of fact are supported by substantial evidence, they are binding on appeal. *Capital Promotions, L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 833 (Iowa 2008). We are not bound, however, by the district court's application of legal principles or conclusions of law. *Rucker v. Taylor*, 828 N.W.2d 595, 599 (Iowa 2013).

" '[W]e accept as true the allegations of the petition and the contents of uncontroverted affidavits.' " *Addison Ins. Co. v. Knight, Hoppe, Kurnik & Knight, L.L.C.*, 734 N.W.2d 473, 476 (Iowa 2007) (quoting *Aquadrill, Inc. v. Envtl. Compliance Consulting Servs., Inc.*, 558 N.W.2d 391, 392 (Iowa 1997)). The plaintiff has the burden to establish jurisdiction over the defendant, and "[a]fter the plaintiff makes a prima facie case showing that personal jurisdiction is appropriate, the burden

---

[2]In April 2012, Ostrem filed a motion to issue commissions for out-of-state subpoenas requesting that the Polk County District Court issue a commission to the Florida courts to issue subpoenas for discovery, which would compel Imperial to produce certain documents in its possession. PrideCo resisted the motion.

In May 2012, Ostrem filed a motion for temporary injunction to enjoin PrideCo from litigating the Georgia case. Ostrem argued the Iowa and Georgia actions are essentially the same and, because the Iowa case was filed first, the Iowa case should proceed first. He argued also that Georgia cannot exercise personal jurisdiction over David, Kobernusz, and AIP, so only Iowa can dispose of all the claims associated with this transaction. PrideCo resisted.

shifts to the defendant to rebut that showing." *Shams*, 829 N.W.2d at 853.

We also review a district court's decision on a motion to dismiss for failure to state a claim for correction of errors at law. *Dier v. Peters*, 815 N.W.2d 1, 4 (Iowa 2012). "A motion to dismiss admits the well-pleaded facts in the petition, but not the conclusions." *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 8 (Iowa 2006). A court should grant a motion to dismiss for failure to state a claim only if the petition shows the plaintiff cannot recover under any state of facts. *Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 604 (Iowa 2012).

### III. Discussion.

**A. Principles of Personal Jurisdiction.** The Due Process Clause of the Fourteenth Amendment to the United States Constitution limits the power of a state to assert personal jurisdiction over a nonresident defendant. *Shams*, 829 N.W.2d at 854; *Capital Promotions*, 756 N.W.2d at 833. Iowa's jurisdictional rule prescribes: "Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state . . . ." Iowa R. Civ. P. 1.306. Iowa's "rule authorizes the widest jurisdictional parameters allowed by the Due Process Clause." *Capital Promotions*, 756 N.W.2d at 833; *accord Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010) (explaining the reach of Iowa's long-arm statute).

"The touchstone of the due-process analysis remains whether the defendant has sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Viasystems, Inc. v. EBM-Papst St.*

*Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95, 102 (1945)). A defendant's "minimum contacts must show 'a sufficient connection between the defendant and the forum state so as to make it fair' and reasonable to require the defendant to come to the state and defend the action." *Ross v. First Sav. Bank of Arlington*, 675 N.W.2d 812, 815 (Iowa 2004) (quoting *Hodges v. Hodges*, 572 N.W.2d 549, 551 (Iowa 1997)). Random or attenuated contacts with the forum state do not satisfy the minimum contacts test. *Id.* at 816. A defendant, rather, "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 501 (1980).

There are two grounds for personal jurisdiction, general jurisdiction and specific jurisdiction. *Shams*, 829 N.W.2d at 855; *Capital Promotions*, 756 N.W.2d at 833. "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state." *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993). "General jurisdiction, on the other hand, refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Id.* The parties agree that only specific personal jurisdiction is at play in this dispute. However, Ostrem contends that PrideCo's direct and indirect contacts, imputed from its assignor, Imperial, are sufficient to permit the Iowa district court to exercise specific personal jurisdiction over PrideCo.

To determine whether a court's exercise of specific personal jurisdiction over a party is constitutional, "the critical focus is on the relationship among the defendant, the forum and the litigation." *Meyers v. Kallestead*, 476 N.W.2d 65, 67 (Iowa 1991); *see also In re Marriage of*

*Crew*, 549 N.W.2d 527, 530 (Iowa 1996) (explaining that the "focus, for jurisdictional purposes, rests on the defendant's connection with the *litigation* in the forum state, not the defendant's connection with *residents* in that state"). Although the application of the test will "vary with the quality and nature of the defendant's activity," in every case there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283, 1298 (1958). The unilateral activities of a plaintiff or some other entity cannot satisfy the minimum contacts requirement. *Id.* at 253, 78 S. Ct. at 1239–40, 2 L. Ed. 2d at 1298; *see also Hager v. Doubletree*, 440 N.W.2d 603, 607 (Iowa 1989) (analyzing a situation in which an entity instigated contact with the defendant that ultimately gave rise to a long-term contractual relationship). A contract between an individual and an out-of-state party alone does not establish sufficient minimum contacts to permit the individual's state to exercise specific personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 2185, 85 L. Ed. 2d 528, 544–45 (1985); *see also Ross*, 675 N.W.2d at 816; *Cascade Lumber Co. v. Edward Rose Bldg. Co.*, 596 N.W.2d 90, 92 (Iowa 1999). Rather, a court must evaluate the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine "whether the defendant purposefully established minimum contacts within" a state. *Burger King Corp.*, 471 U.S. at 479, 105 S. Ct. at 2185, 85 L. Ed. 2d at 545.

In the past we have used a five-factor test to evaluate whether a nonresident defendant had sufficient minimum contacts with Iowa.

*Shams*, 829 N.W.2d at 856; *Capital Promotions*, 756 N.W.2d at 833–34 (explaining the development of the five-factor test and the recent use by the United States Supreme Court of a two-prong test).  In those cases we examined the quantity of a defendant's contacts with Iowa, the nature and quality of those contacts, the source of the contacts and their connection to the cause of action, Iowa's interest in the litigation, and the convenience to the parties.  *See, e.g.*, *Hammond*, 695 N.W.2d at 5; *Ross*, 675 N.W.2d at 816; *Cascade Lumber*, 596 N.W.2d at 92.  Although we have never expressly disavowed the five-factor test, we have recently followed the modern framework, which evaluates two criteria.  *Shams*, 829 N.W.2d at 856; *Capital Promotions*, 756 N.W.2d at 834.  We evaluate whether " 'the defendant has "purposefully directed" his activities at residents of the forum' " and whether " 'the litigation results from alleged injuries that "arise out of or relate to" those activities.' " *Capital Promotions*, 756 N.W.2d at 834 (quoting *Burger King Corp.*, 471 U.S. at 472, 105 S. Ct. at 2182, 85 L. Ed. 2d at 541).

If a plaintiff establishes the existence of sufficient minimum contacts, the court must " 'determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' " *Id.* (quoting *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543).  To make this decision, we consider

> "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies."

*Id.* (quoting *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543).  " 'These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum

contacts than would otherwise be required.' " *Id.* (quoting *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543–44). We are careful, though, not to allow jurisdictional rules to be employed to severely disadvantage defendants. *Shams*, 829 N.W.2d at 857.

**B. Imputation of Minimum Contacts.** This court has never addressed whether the jurisdictional contacts of an assignor impute to its assignee. Ostrem argues that our reasoning in *Ross* implies that we would impute an assignor's contacts to its assignee for purposes of personal jurisdiction. *See* 675 N.W.2d at 817 (distinguishing a loan participation agreement from an assignment). We disagree and do not believe that case implies we would impute the contacts of an assignor to an assignee.

In *Ross*, the plaintiffs purchased memberships in a nationwide network of campgrounds through real estate installment contracts with Thousand Adventures, Inc. *Id.* at 814. Thousand Adventures, Inc. in turn sold pools of the installment contracts to financial institutions and investors, including Western American National Bank of Bedford, Texas (Western). *Id.* Western then sold by a "Certificate of Participation" fractional interests in its pool of installment contracts to other banks, one of which was First Savings Bank of Arlington (First Savings). *Id.* There was no contract between First Savings and the plaintiffs, First Savings had no property, offices, or agents in Iowa, and First Savings had not conducted any business in Iowa. *Id.* at 815.

On appeal of the district court's dismissal of the claim against First Savings for lack of personal jurisdiction, the plaintiffs, apparently recognizing that a contract alone does not establish sufficient minimum contacts, argued that the agreement between First Savings and Western was an assignment and sought "to use the terms and circumstances

surrounding the installment contracts to drive the minimum contacts analysis." *Id.* at 816. We clarified that the agreement between First Savings and Western was not an assignment but rather a participation agreement. *Id.* at 817. In a participation agreement, a lender, known as the lead bank, contracts with a "borrower or obtains an assignment of a contract with the borrower." *Id.* The lead bank, Western in *Ross,* then sells shares of the loan to other banks, known as participant banks, which have no direct contacts with the forum state and no relationship with the borrower. *Id.* We found that although the participation agreement had some elements of an assignment, it fell "well short of the traditional concept of an assignment because it merely involve[d] the transfer of a portion of an intangible right." *Id.* We concluded that it would not be reasonable for a participant bank, like First Savings, to foresee litigation in Iowa, "absent some additional contacts beyond its status as a participating bank." *Id.* at 818.

Ostrem seizes on *Ross* to argue that had the agreement at issue in *Ross* been an assignment instead of a participation agreement, we would have examined the terms and circumstances surrounding the installment contracts to decide whether there were sufficient minimum contacts to exercise personal jurisdiction. Our analysis in *Ross,* however, focused on identifying the nature of the agreement between the parties, which necessarily arose from the plaintiff's attempt to characterize the agreement as something that it clearly was not. *See id.* at 816 (explaining that "it is appropriate for us to begin our resolution of the issue by reviewing the nature of the agreement between First Savings and Western"). Merely because we concluded that it was a participation agreement, the nature of which revealed "the participant bank has no purposeful contact with Iowa," Ostrem should not now infer that we

would have imputed the lead bank's jurisdictional contacts had the agreement indeed been an assignment. *See id.* at 818.

We did not hold in *Ross* that there was no personal jurisdiction over the participant bank solely because the agreement into which it entered was a participation agreement instead of an assignment. *See id.* We found that those types of agreements alone do not establish minimum contacts and that the participant bank's contacts were insufficient to satisfy the minimum contacts requirement. *See id.* Our holding was consistent with the United States Supreme Court's admonition that the minimum contacts test "is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." *Kulko v. Superior Ct. of Cal.*, 436 U.S. 84, 92, 98 S. Ct. 1690, 1697, 56 L. Ed. 2d 132, 141 (1978) (quoting *Hanson*, 357 U.S. at 246, 78 S. Ct. at 1235, 2 L. Ed. 2d. at 1293). We reject Ostrem's assertion that *Ross* implies anything about the determination whether the contacts of an assignor impute to its assignee.

The district court rejected Ostrem's assertion that an assignee steps into the shoes of its assignor for purposes of minimum contacts analysis. In doing so, it relied on *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003), a federal appeals court case. In that case, Purdue Research Foundation (PRF) entered into a cooperative research agreement with Sterling Drug, Inc. (Sterling Drug) to develop antiviral drugs. *Id.* at 776. The contract provided for application of Indiana law, but it did not contain a forum selection clause or any stipulation regarding personal jurisdiction in Indiana. *Id.* at 777.

During the five-year contract period, the parties developed pleconaril, a drug for the common cold. *Id.* After the contract expired,

Sterling Drug's successor obtained a patent for pleconaril and then sold, as part of a package of assets, the pleconaril patent and other intellectual property to a French company that later became SSBO France, which retained all property rights to pleconaril. *Id.* Later, PRF brought a breach of contract suit in Indiana federal court against SSBO France. *Id.* at 778.

SSBO France moved to dismiss for lack of personal jurisdiction. *Id.* SSBO France was a French corporation that did not manufacture or sell goods in Indiana, did not perform any services in Indiana, had no employees or real estate in Indiana, and did not maintain any offices in Indiana. *Id.* Moreover, there was no evidence to suggest that representatives of SSBO France ever physically entered Indiana in furtherance of the research agreement or communicated with PRF about the research agreement. In contrast, Sterling Drug had maintained communications with PRF through mail, telephone, and other means, and its personnel had made physical visits to Purdue University in Indiana. *Id.* at 777–78.

PRF made a contacts-imputation argument. *Id.* at 783. PRF argued that because Sterling Drug was subject to specific personal jurisdiction in Indiana on the basis of the research agreement, SSBO France, as successor in interest to Sterling Drug, was also subject to personal jurisdiction. *Id.* SSBO France argued that it was not a successor in interest, but rather an assignee because it did not obtain full ownership of Sterling Drug. *Id.* at 783–84. It would be unfair, SSBO France insisted, to impute Sterling Drug's contacts to its assignee. *Id.* at 784.

The federal appeals court noted that two other federal circuit courts had imputed the contacts of corporate predecessors to their

corporate successors. *See id.* at 783 (citing *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002), and *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1131 (10th Cir. 1991)). The reasoning behind imputing the contacts of a predecessor to a successor, the court explained, was that the "two corporations 'are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes' " of minimum contacts analysis. *Id.* at 784 (quoting *Patin*, 294 F.3d at 653).

In contrast, the federal appeals court explained that courts were unwilling to impute the contacts of an assignor to its assignee. *Id.*; *see, e.g.*, *Rogers v. 5-Star Mgmt., Inc.*, 946 F. Supp. 907, 913 (D.N.M. 1996) (explaining that a court should not exercise personal jurisdiction over an assignee "solely on the basis of its relationship with the" assignor). It found the distinction drawn in cases between a corporate successor and an assignee to be "a sound one," particularly in light of the "Supreme Court's emphasis on the need for an individual" evaluation of a defendant's contacts with the forum state. *Purdue Research Foundation*, 338 F.3d at 784. The expectations of a corporate successor and an assignee are different, the court reasoned. *See id.* Because the successor "has chosen to stand in the shoes of its predecessor and has chosen to accept" the expectations of the predecessor's business partners, the successor should foresee litigation in the same courts as its predecessor. *Id.* An assignee, however, does not have the same relationships with the entities that had dealt with the assignor; an assignee merely purchases contractual rights and assumes obligations. *See id.*

Nothing in the record suggested SSBO France was a " 'mere continuation' " of Sterling Drug. *Id.* at 785. The two companies

had not merged. *Id.* Neither had SSBO France purchased all or substantially all of Sterling Drug's assets. *Id.* Rather, SSBO France purchased particular assets from Sterling Drug. *Id.* In affirming the dismissal for lack of personal jurisdiction, the court concluded that a "general rule" imputing an assignor's contacts to its assignee "would, at least in some cases, violate the established norms of due process." *Id.* at 784.

Ostrem argues the reasoning of *Purdue Research* is flawed and that we should impute the jurisdictional contacts of an assignor to its assignee. To be clear, Ostrem does not argue PrideCo is Imperial's successor in interest. He concedes PrideCo is an assignee, and the record indicates nothing to the contrary. The flaw of *Purdue Research*, Ostrem insists, is that it drew a distinction where none in reality exists between corporate successors and assignees. PrideCo argues that mechanically imputing the contacts of the assignor to its assignee would violate due process.

Like the *Purdue Research* court, other courts have balked at adopting a general rule that imputes the contacts of an assignor to its assignee for purposes of minimum contacts analysis. In two federal cases in which assignees held just a small percentage of mortgages in a large package, the assignees were found not subject to specific personal jurisdiction. *See Williams v. Firstplus Home Loan Owner Trust 1998-4*, 310 F. Supp. 2d 981, 995 (W.D. Tenn. 2004) (dismissing for lack of personal jurisdiction a claim against assignee purchaser of "consolidated loan pools that happened to include loans secured by real property in Tennessee"); *Pilcher v. Direct Equity Lending*, 189 F. Supp. 2d 1198, 1209–10 (D. Kan. 2002) (dismissing claim against assignees for lack of personal jurisdiction). A federal court sitting in Massachusetts, noting

courts' resistance to a rule that mechanically imputes the assignor's contacts to the assignee, dismissed a claim for lack of personal jurisdiction because the plaintiff failed to produce evidence to suggest that a defendant was a corporate successor. *See TomTom, Inc. v. Norman IP Holdings, LLC*, 890 F. Supp. 2d 160, 168 (D. Mass. 2012) (dismissing claim for lack of general personal jurisdiction). *But see Stavrides v. Zerjav*, 848 S.W.2d 523, 528–29 (Mo. Ct. App. 1993) (holding court lacked personal jurisdiction because the plaintiff failed to show defendant was an assignee of a promissory note). One federal court, which ultimately found personal jurisdiction on the basis of the assignee's individual contacts, believed nevertheless "that a general rule that imputes an assignor's forum contacts to the assignee would violate due process." *Moxie Java Int'l, LLC v. Cornucopia Beverages, Inc.*, No. CV-07-535-S-BLW, 2009 WL 187893, at *4 (D. Idaho Jan. 23, 2009). Another federal court favored an individual assessment, holding that "an assignee does not automatically step into the shoes of the assignor for purposes of personal jurisdiction." *Harbor Cold Storage, LLC v. Strawberry Hill, LLC*, No. C09-1252JLR, 2009 WL 3765361, at *4 (W.D. Wash. Nov. 9, 2009).

On the other hand, courts commonly impute a corporate predecessor's contacts to its successor in order to exercise personal jurisdiction over the successor. *See, e.g., Patin*, 294 F.3d at 653 (explaining consistent recognition by federal courts that the successor may be subject to personal jurisdiction on basis of predecessor's contacts); *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999) (stating that court gains personal jurisdiction over successor in interest by way of predecessor's contacts); *Williams*, 927 F.2d at 1132 (permitting imputation of contacts if successor is liable for actions of predecessor

under forum law); *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454–55 (4th Cir. 1990) (stating rule and finding personal jurisdiction under Virginia's successor liability law); *Minnesota Mining & Mfg. Co. v. Eco Chem. Inc.*, 757 F.2d 1256, 1263 (Fed. Cir. 1985) ("When the successor in interest voluntarily steps into the shoes of its predecessor, it assumes the obligations of the predecessor's pending litigation if the court properly assumed jurisdiction over the predecessor . . . ."); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982) (holding if a constituent corporation's contacts are sufficient for personal jurisdiction, a court may exercise personal jurisdiction over the successor).[3] Imputing the contacts of a predecessor corporation to its

---

[3]Aside from these above-cited cases, there are numerous other instances of courts imputing the contacts of a predecessor to its successor. *See, e.g.*, *Opportunity Fund, LLC, v. Epitome Systems, Inc.*, 912 F. Supp. 2d 531, 538–40 (S.D. Ohio 2012) (analyzing the contacts of a corporate predecessor to determine whether the court could exercise personal jurisdiction over successor); *Oticon, Inc. v. Sebotek Hearing Sys. LLC*, 865 F. Supp. 2d 501, 508–09 (D.N.J. 2011) (applying New Jersey successor liability law to determine whether to exercise jurisdiction over purported corporate successor); *Perceptron, Inc. v. Silicon Video, Inc.*, 423 F. Supp. 2d 722, 725 (E.D. Mich. 2006) (stating that "a predecessor corporation's contacts with the forum state can be imputed to its successor corporation for the purposes of determining the surviving corporation's susceptibility to personal jurisdiction"); *Patrick v. Mass. Port Auth.*, 141 F. Supp. 2d 180, 185–86 (D.N.H. 2001) (applying New Hampshire state law to determine whether a purported successor was subject to personal jurisdiction based on predecessor's contacts); *Linzer v. EMI Blackwood Music, Inc.*, 904 F. Supp. 207, 213 (S.D.N.Y. 1995) (stating a corporate successor may be subject to personal jurisdiction if the predecessor and successor are "one and the same" and "the predecessor continue[s] to exist as part of the successor"); *Inter-Americas Ins. Corp. v. Xycor Sys., Inc.*, 757 F. Supp. 1213, 1218 (D. Kan. 1991) (adopting rule that contacts of predecessor impute to successor when the successor would be liable under Kansas successor liability law); *Colson Servs. Corp. v. Bank of Baltimore*, 712 F. Supp. 28, 30 (S.D.N.Y. 1989) (stating general rule that under certain conditions a corporate successor may be subject to jurisdiction based on the activities of its predecessor); *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644, 658 (Mich. 1995) (holding "the jurisdictional contacts of a predecessor can be imputed to a successor when the successor expressly assumes all liabilities of the predecessor"); *Bennett v. Rapid Am. Corp.*, 816 S.W.2d 677, 678 (Mo. 1991) (noting widespread imputation of predecessor's jurisdictional contacts to successor and citing cases); *Simmers v. Am. Cyanamid Corp.*, 576 A.2d 376, 390 (Pa. Super. 1990) (concluding "the acts of a predecessor corporation may be attributed to its successor for the purposes of determining whether jurisdiction is proper").

successor prevents mischief that might occur if corporations and other entities were able to shirk liability by switching names. *See Duris*, 684 F.2d at 356 (explaining that not imputing the contacts of a predecessor to a successor for purposes of personal jurisdiction "would allow corporations to immunize themselves by formalistically changing their titles"); *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644, 653 (Mich. 1995) ("The primary rationale . . . is that corporations should be prevented from using organizational changes to avoid jurisdiction in states where they have previously done business."). These cases typically recognize "[a] corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor." *Williams*, 927 F.2d at 1132; *see also Crawford Harbor Assocs. v. Blake Constr. Co.*, 661 F. Supp. 880, 883 (E.D. Va. 1987) ("If the successor is to stand thus in the place of the predecessor, it must do so for all purposes, including personal jurisdiction in the first instance."). Therefore the starting point for courts deciding whether to impute the jurisdictional contacts of a corporate predecessor to its successor is state substantive corporate successor law. *See, e.g., Williams*, 927 F.2d at 1132 (discussing Oklahoma substantive successor liability law); *Duris*, 684 F.2d at 356 (applying Ohio law); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 508–09 (applying New Jersey corporate successor liability law to determine whether to impute the predecessor's contacts to the successor); *Crawford Harbor Assocs.*, 661 F. Supp. at 883 (applying Virginia substantive law).

We held in *Hagan v. Val-hi, Inc.* that personal jurisdiction could be exercised over a successor corporation that resulted from a series of mergers. 484 N.W.2d 173, 178 (Iowa 1992). We cited several federal cases for the general rule that the contacts of a constituent corporation,

which is one existing before a merger, may be imputed to its successor. *See id.* at 176 (citations omitted). As other courts had done, we looked to our substantive corporate law to determine whether a successor corporation could recover for money due its predecessor and whether the successor would be liable for the predecessor's debts. *See id.* at 176–77. We reasoned that because Iowa corporate law statutes granted the successor the right to collect amounts due its constituent corporation and subjected the successor to liability, "the merger itself [was] a sufficient minimum contact warranting the assertion of personal jurisdiction." *Id.* at 177.

"In Iowa, a corporation that acquires the assets of another company generally will not be held liable for the debts of that company." *Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1281 (8th Cir. 1994); *see also Arthur Elevator Co. v. Grove*, 236 N.W.2d 383, 391 (Iowa 1975) (stating general rule that the purchaser of corporate assets is generally not liable for the debts of the transferor). In *Grundmeyer v. Weyerhaeuser Co.*, for instance, one company purchased some of another company's assets and "assumed only *limited* liabilities." 649 N.W.2d 744, 751 (Iowa 2002). We found no evidence to suggest that the transferor retained any ownership or control of the transferee company. *Id.* at 752. On those facts, we concluded the transferee was not subject to successor liability. *See id.* at 752 (upholding workers' compensation commissioner's finding that transferee was not subject to successor liability).

There are four circumstances under which we will subject a successor to liability. *See Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200 (Iowa 1996). A successor will be liable for the predecessor's debts when: the parties agree that the successor will assume the predecessor's

debts and liabilities; there is a consolidation or merger of the two corporations; the successor is a "mere continuation" of the predecessor; or the transaction was in fact fraudulent. *Grundmeyer*, 649 N.W.2d at 751–52; *DeLapp v. Xtraman, Inc.*, 417 N.W.2d 219, 220 (Iowa 1987); *Arthur Elevator Co.*, 236 N.W.2d at 391; *Luedecke v. Des Moines Cabinet Co.*, 140 Iowa 223, 226, 118 N.W. 456, 457 (1908). One theme of these cases is that a successor is liable when it is not distinct from its predecessor. *See, e.g., Nelson v. Pampered Beef-Midwest, Inc.*, 298 N.W.2d 281, 287–88 (Iowa 1980) (explaining the application of the "mere continuation" and merger exceptions); *Arthur Elevator Co.*, 236 N.W.2d at 392 (citing cases from other jurisdictions that focused on the sameness of the predecessor and successor); *see also In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 572 (9th Cir. 2012) (explaining that in Washington, which recognizes the general rule of successor liability and the continuation exception, "[t]he nub of the inquiry is whether the purchaser represents merely a new hat for the seller" (internal quotation marks omitted)).

We applied one of the four exceptions in *Arthur Elevator*. 236 N.W.2d at 392–93. In that case, a partnership incurred debts and afterward was purchased by a corporation. *See id.* at 386. The partnership and corporation had the same name, some of the partners became corporate directors, one erstwhile partner became the new corporation's president, and the corporation "retained the partnership's manager, set of books, and bookkeeping system." *Id.* at 392–93. The company's line of business also remained the same. *Id.* at 393. After reviewing cases from several other jurisdictions, we held on these facts that the corporation was a mere continuation of the previous partnership. *Id.* at 392–93.

The relationship between an assignor and an assignee does not bear the same characteristics as the relationship between a predecessor and a successor. In an assignment, an assignor transfers to its assignee "the whole of any property or right in the property." *Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 533 (Iowa 1995); *see* 6A C.J.S. *Assignments* § 2, at 396 (2004) (defining assignment as a "transfer or making over to another of the whole of any property, real or personal"). "An assignee is one to whom [a] right or property is assigned" by sale or other transfer. 6A C.J.S. *Assignments* § 4, at 398. The assignee assumes the assignor's rights, remedies, and benefits under the assignment but is "subject to all defenses to which the assignor is subject." *Red Giant,* 528 N.W.2d at 533; *see also Kintzel v. Wheatland Mut. Ins. Ass'n,* 203 N.W.2d 799, 806 (Iowa 1973) (noting an assignment carries with it all rights, remedies, benefits incidental to the assigned thing); 6A C.J.S. *Assignments* § 87, at 476 (describing an assignment as vesting "in the assignee the same right, title, or interest that the assignor had in the thing assigned"). An assignee, unlike a successor, thus assumes a limited bundle of rights, obligations, and expectations. *See Purdue Research,* 338 F.3d at 784.

*Red Giant* illustrates the limitations of the relationship between an assignor and assignee. In that case, a welder negligently performed welding for Red Giant, and the welder's insurance company refused to defend him. *Red Giant,* 528 N.W.2d at 527. Red Giant obtained a judgment against the welder, and the welder afterward assigned his right of action against the insurance company to Red Giant. *See id.* at 527–28. In exchange, Red Giant agreed not to execute against the welder. *Id.* at 528.

There was no indication in *Red Giant* that Red Giant assumed any liabilities or debts of the welder, by agreement, merger, or otherwise. The

assignment of this limited right to pursue a claim, which we found "not inherently collusive or fraudulent," *id.* at 533, resembled a bona fide transfer of assets, the type to which the general rule against corporate successor liability ordinarily extends its protection, *see id.* (explaining the characteristics of an assignment). *See also Grundmeyer,* 649 N.W.2d at 752 (holding there was no successor liability); *see also Pancratz,* 547 N.W.2d at 201 ("It is generally recognized that the general rule of corporate successor nonliability developed 'as a response to the need to protect bonafide purchasers from unassumed liability.' " (quoting *Tucker v. Paxson Mach. Co.,* 645 F.2d 620, 623 (8th Cir. 1981)); *Luedecke,* 140 Iowa at 228, 118 N.W. at 457 (explaining that "a corporation . . . may transfer its property in good faith to a *bona fide* purchaser, and such purchaser will hold it free from the debts of the corporation"). The relationship between the welder and Red Giant, assignor and assignee, exhibited none of the pertinent characteristics of the relationships between entities in the cases in which we have found a successor liable for its predecessor's debts. *See Arthur Elevator,* 236 N.W.2d at 393 (concluding corporation was a continuation of partnership). Thus, *Grundmeyer, Arthur Elevator,* and *Red Giant,* taken together, stand at least for the proposition that, contrary to Ostrem's assertion, there is a distinction in substantive law between a corporate successor and an assignee or asset purchaser.

The substantive distinction between corporate successors and assignees is meaningful in this personal jurisdiction case. The premise underlying the four exceptions to the general rule barring successor liability and the rule imputing the contacts of a corporate predecessor to its successor is the same: the successor "is, in fact, *the same corporate entity* as the predecessor corporation." *See Patin,* 294 F.3d at 654

(explaining the rationale for imputing the predecessor's waiver of personal jurisdiction to its successor); *see also Linzer*, 904 F. Supp. at 213 (conditioning successor's imputation of jurisdictional contacts on findings that "predecessor and successor [were] one and the same and that the predecessor continue[d] to exist as part of the successor"). By contrast, there is no similar unifying premise underlying a rule that would mechanically impute the contacts of an assignor to its assignee because the two entities retain their separate identities.

The relationship between PrideCo and Imperial does not exhibit the characteristics of a corporate successor relationship. Nothing in this record suggests that PrideCo has the same owner or management as Imperial, that it agreed to assume all of Imperial's debts and liabilities, that there was any merger of the two, or any fraudulent transactions between the two. *See Arthur Elevator Co.*, 236 N.W.2d at 391 (listing exceptions to general rule against successor liability). Here, like the plaintiff in *Red Giant*, PrideCo received an assignment in exchange for not pursuing its rights against Imperial. *See* 528 N.W.2d at 528. Without more, our substantive law would not hold PrideCo, a mere assignee, liable as a corporate successor to Imperial because the two companies are not the same entity. *See generally Grundmeyer*, 649 N.W.2d at 751–52 (holding company that purchased assets and assumed liabilities was not a successor of another company); *Pancratz*, 547 N.W.2d at 202 (finding corporation was not continuation of another corporation). Therefore, we do not mechanically impute Imperial's jurisdictional contacts to PrideCo. PrideCo "cannot be considered to stand in the shoes" of Imperial for purposes of personal jurisdiction. *Purdue Research*, 338 F.3d at 783.

But rejecting mechanical imputation of contacts does not resolve the issue. As the federal circuit court in *Purdue Research* recognized, "a general rule that imputes the assignor's forum contacts to the assignee would, at least in some cases, violate the established norms of due process." *See* 338 F.3d at 784. We avoid that concern by focusing on PrideCo's own contacts with Iowa—specifically the contractual relationships it assumed by assignment.

Unlike the assignees in *Purdue Research*, *Pilcher*, and *Williams*, who received packages of property that happened to include the assignment from which the dispute arose, PrideoCo did not buy a group of assets; it entered into a single "Assignment and Assumption Agreement," acquiring a single life insurance financing relationship with an Iowan. *See Purdue Research*, 338 F.3d at 776–77; *Williams*, 310 F. Supp. 2d at 995; *Pilcher*, 189 F. Supp. 2d at 1209. PrideCo received documents that disclosed that Ostrem, the personal guarantor, resided in Iowa, that Mrs. Ostrem resided in Iowa, and that both had executed the underlying loan documents in Iowa. Although a Georgia trust had been formed with Mrs. Ostrem as a cotrustee, the record supports an inference that PrideCo was aware the trust had no assets. Thus, PrideCo would have known the responsibility for any unpaid financial obligation—an obligation that PrideCo would have known could reach nearly $2 million in principal alone—would fall on Ostrem, an Iowan. Similarly, PrideCo would have known from the information available to it that it could become a party to litigation in Iowa.

The record reveals PrideCo's significant involvement in the financing arrangement, before and after the assignment. Brandon Small revealed to David, Ostrem's son, that PrideCo had been involved in the financial transactions relating to the life insurance policy since 2007.

PrideCo first loaned money to Imperial to fund the insurance premiums in May 2009. After the assignment in 2010, PrideCo advanced $33,000 each month to fund the life insurance premiums. According to PrideCo's own projection, contained in a letter sent to Ostrem at his Iowa address in June 2011, the loan for the life insurance premiums would reach its maximum principal balance in February 2012. At that time, after several more advances by PrideCo, the entire balance, more than $2.6 million, would become due. Ostrem, the letter warned, would be responsible. PrideCo, like Imperial, surely "contemplated future consequences" of the financing arrangement with Ostrem. *See Burger King Corp.*, 471 U.S. at 479, 105 S. Ct. at 2185, 85 L. Ed. 2d at 545 (considering "contemplated future consequences" as one factor to determine whether a defendant established minimum contacts with a forum).

The documents that support the financing arrangement were the product of extensive back-and-forth among Iowans and Imperial. The documents that were assigned to PrideCo are the product of these extensive negotiations. The various documents that are the foundation of this assignment support invoking the jurisdiction of Iowa's courts.

Forum selection clauses like those found in the supporting documents permit Iowa's courts to exercise personal jurisdiction over consenting parties. *See EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 300 (Iowa 2000) (holding district court did not err by exercising personal jurisdiction over a nonresident corporation on the basis of a forum selection clause). Likewise, agreements that consist of multiple contract documents are to be read as a whole. *See Burger King Corp.*, 471 U.S. at 465, 105 S. Ct. at 2178, 85 L. Ed. 2d at 536 (referring to "the governing contracts"); *see also St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.,* 108 F. Supp. 2d 1057, 1061 (D. Minn. 2000)

(analyzing the effect of and provisions in multiple contracts to determine whether to exercise personal jurisdiction). One document, titled "Disclosure Statement, Representations and Warranties, and Consent," which was executed by Ostrem and Mrs. Ostrem, mandates that any claims or controversies be submitted to arbitration "in Des Moines, IA." It also provides that if the arbitration provision were held unenforceable, the Ostrems or the trust "irrevocably submit to the exclusive jurisdiction of any federal or state court sitting in Des Moines, IA."

The parties agreed Iowa's courts would have jurisdiction to enforce the loan agreement between Imperial and the trust. The parties agreed "to submit to the personal jurisdiction of the federal and state courts sitting in Des Moines, IA." So too would the trust and Imperial use Iowa's courts to resolve disputes "arising out of or relating to" the promissory note, which provides the trust "agree[d] to be subject to the exclusive jurisdiction of Des Moines, IA." These documents make clear the initial parties to the financing arrangement anticipated litigating in Iowa.

It is true the personal guaranty contains a clause designating Georgia as a forum for disputes arising from the personal guaranty. But the clause is not exclusive. *See, e.g.*, *High Plains Constr., Inc. v. Gay*, 831 F. Supp. 2d 1089, 1101–02 (S.D. Iowa 2011) (distinguishing mandatory and permissive, or exclusive and nonexclusive, forum selection clauses). The clause does not foreclose litigation elsewhere. *See id.* (explaining a permissive clause does not exclude litigation in another forum). Imperial, a sophisticated business entity, could have drafted a different clause in the personal guaranty or in the multitude of other financing documents. The forum selection clause contained in the personal

guaranty is just one forum selection clause among many in the financing arrangement.

One federal court has relied on a forum selection clause in a set of leases to conclude the guarantor had minimum contacts with the forum, even though the contemporaneously executed guaranty expressly authorized a different forum. *See Bistro of Kansas City, Mo., LLC v. Kansas City Live Block 125 Retail, LLC*, No. ELH-10-2726 2011 WL 1063800, at *15 (D. Md. Mar. 18, 2011) (finding personal guarantor had minimum contacts with the forum). Because the guaranties and the leases were negotiated and executed contemporaneously, and because the parties were sophisticated and represented by counsel, the court found the minimum contacts analysis not "entirely separable." *Id.* at *13. Similar facts are present here, though Ostrem contends he is not sophisticated when it comes to no-cost insurance. The personal guaranty and the other financing documents were executed contemporaneously. They were the product of the same negotiations. Regardless of Ostrem's claimed lack of sophistication, Imperial must have understood the effect of its various forum selection clauses. And PrideCo, as a sophisticated entity, must have understood the effect of those clauses when it took the assignment.

When an out-of-state party, like Imperial, insists on the right to sue someone in our courts by contract, it "should reasonably anticipate being haled into court" in Iowa. *World-Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S. Ct. at 567, 62 L. Ed. 2d at 501. The various forum selection clauses reinforce Imperial's "deliberate affiliation with" Iowa "and the reasonable foreseeability of possible litigation" in Iowa. *Burger King Corp.*, 471 U.S. at 482, 105 S. Ct. at 2187, 85 L. Ed. 2d at 547. The

same is true of an out-of-state party who takes a single assignment from a party that insists on the jurisdiction of Iowa's courts.

Imperial's financing arrangement, which resulted from substantial email negotiations between Imperial, Kobernusz, and David, who were in Iowa, was set to last five years and consisted of more than a dozen instruments all executed in Iowa. Before it assigned the financing arrangement, Imperial advanced nearly $2 million to fund the life insurance premiums. Imperial must have contemplated that one future consequence of the arrangement was litigation with an Iowa resident. Imperial must have at least contemplated litigation in Iowa because of the various forum selection clauses, all but the personal guaranty selecting Iowa as the forum. Imperial purposefully directed its activities at residents of Iowa. *See Cascade Lumber*, 596 N.W.2d at 93 (finding months of telephone negotiations and the likelihood a breach of contract would occur in Iowa supported exercise of personal jurisdiction); *Hager*, 440 N.W.2d at 607 (finding telephone and mail contacts and a significant contractual relationship established sufficient minimum contacts); *see also Burger King Corp.*, 471 U.S. at 479, 105 S. Ct. at 2185, 85 L. Ed. 2d at 545 (listing factors to consider in deciding whether a defendant established minimum contacts). Clearly the cause of action regarding the personal guaranty, as one part of the financing arrangement, arises out of these contacts with Iowa. *See Capital Promotions*, 756 N.W.2d at 834 (explaining requirement that injuries arise out of defendant's contacts with the forum). Imperial had sufficient minimum contacts with Iowa to support personal jurisdiction.

Through the various documents and agreements, PrideCo effectively assumed Imperial's contacts with Iowa. Due process is not violated by requiring PrideCo to litigate in Iowa based on the contractual

relationships it agreed to accept by its assignment from Imperial. While there was just one assignment rather than a package deal, PrideCo was involved in the financing arrangement before the assignment, and multiple forum selection clauses, which PrideCo would have had knowledge of, designated Iowa as the forum for resolving disputes. PrideCo knew that the subject of any future litigation was an Iowa resident. After the assignment, PrideCo continued to advance funds each month to fund the life insurance premiums on behalf of Ostrem, an Iowa resident. *Cf. McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223–24, 78 S. Ct. 199, 201–02, 2 L. Ed. 2d 223, 226–27 (1957) (holding constitutional the exercise of personal jurisdiction over an out-of-state insurance company that assumed another insurance company's obligations to the insured and continued to comply with the terms of the original agreement). PrideCo plainly cannot claim that it could not foresee litigating in Iowa when it took the assignment and continued advancing money under the financing arrangement.

Having found the necessary minimum contacts with Iowa, we must now " 'determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' " *Capital Promotions*, 756 N.W.2d at 834 (quoting *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543). The burden of litigating in Iowa on PrideCo, a California partnership, is no greater than would be the burden of litigating in Georgia. Certainly the burden of litigating in Georgia for Ostrem, where PrideCo filed its lawsuit, is at least as heavy as the burden of litigating in Iowa for PrideCo. *See Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1081 (9th Cir. 2003) (finding the burden on the plaintiff of litigating in the defendant's domicile equal to or greater than the burden placed on the defendant by litigating in the plaintiff's chosen

forum); *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003) (comparing the burden on the defendant of litigating in the chosen forum to the burden on the plaintiff of litigating in the defendant's home state). The minimal burden on PrideCo strongly favors the exercise of personal jurisdiction by Iowa's courts. *See World-Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S. Ct. at 564, 62 L. Ed. 2d at 498 (stating the burden on the defendant is "always a primary concern" among the other fairness factors).

Two other factors are in this case decisive. First, Iowa has a legitimate interest in adjudicating a dispute between one of its residents, as Ostrem was when he executed the personal guaranty, and an out-of-state entity that established contacts with this state. *See Burger King Corp.*, 471 U.S. at 482–83, 105 S. Ct. at 2187, 85 L. Ed. 2d at 547 (finding the forum state's legitimate interest in adjudicating a dispute sufficient for purposes of personal jurisdiction). Certainly Iowa "has a manifest interest in providing effective means of redress for its residents." *McGee*, 355 U.S. at 223, 78 S. Ct. at 201, 2 L. Ed. 2d at 226.

Ostrem's interest in obtaining convenient and effective relief also favors jurisdiction in Iowa because, as he points out, he likely has no mechanism by which to bring Kobernusz and AIP, both named in his petition, before a Georgia court. *See Shams*, 829 N.W.2d at 857 (listing the plaintiff's interest in obtaining convenient and effective relief as one factor in fairness analysis). Thus, exercising personal jurisdiction over PrideCo provides an effective and convenient means of relief from the parties named in Ostrem's petition. These two factors alone, "the interests of the plaintiff and the forum," the United States Supreme Court has explained, often "will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Super Ct. of Cal.*, 480

U.S. 102, 114, 107 S. Ct. 1026, 1033, 94 L. Ed. 2d 92, 105–06 (1987). As noted, the burden on PrideCo of defending in Iowa is comparatively light. Accordingly, we find the assertion of personal jurisdiction over PrideCo would be neither unfair nor unjust.

**C. Failure to State a Claim.** Because the district court found it lacked personal jurisdiction over PrideCo, it did not address PrideCo's motion to dismiss for failure to state a claim. PrideCo argues we should affirm the district court on this alternative ground. "If we disagree with the basis for the court's ruling, we may still affirm if there is an alternative ground, raised in the district court and urged on appeal, that can support the court's decision." *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811–12 (Iowa 2000). Because we disagreed with the district court's ruling on personal jurisdiction, we must decide whether the court's ruling can be affirmed on the motion to dismiss for failure to state a claim, which PrideCo raised in the district court and again on appeal. *See Hawkeye Foodservice*, 812 N.W.2d at 610 (considering alternative grounds for dismissal after reversing district court's ruling that the plaintiff lacked standing).

Ostrem's petition contains three claims against PrideCo. To survive a motion to dismiss, Ostrem's petition need only allege facts that, if they were proven, would entitle him to recovery. *See id.* at 612. The petition must give "fair notice" of the plaintiff's claim, a standard met if the petition "informs the defendant of the incident giving rise to the claim and of the claim's general nature." *U.S. Bank v. Barbour*, 770 N.W.2d 350, 354 (Iowa 2009). We view the allegations in the petition in the light most favorable to the plaintiff. *Rees v. City of Shenandoah*, 682 N.W.2d 77, 79 (Iowa 2004). It is a rare case that does not survive a motion to dismiss for failure to state a claim. *See U.S. Bank*, 770 N.W.2d at 353

("Nearly every case will survive a motion to dismiss under notice pleading.").

In Ostrem's first count, he seeks a declaratory judgment that the personal guaranty is not valid. He alleges that the personal guaranty purports to make him liable for amounts due on the "Loan." The term "Loan" is defined as the loan made "[p]ursuant to a credit agreement" between Imperial and the trust and "evidenced by the Secured Promissory Note." Ostrem alleges no documents exist with these titles or substance, so the personal guaranty purports to hold him liable for a loan that does not exist. Viewing the allegations in the light most favorable to Ostrem, we conclude the facts pled in Ostrem's first count inform PrideCo of the incident underlying the claim and the claim's general nature. *See id.* at 354. Accordingly, the facts pled are sufficient to survive PrideCo's motion to dismiss.

In Ostrem's second count, he seeks a declaratory judgment. Ostrem alleges under Georgia law the doctrine of in pari delicto precludes "a party from enforcing a contract where the contract was based on fraudulent conduct and the party seeking to enforce it is equally or more blameworthy than the party it is seeking to enforce the contract against." He then alleges Imperial engaged in a scheme to defraud Aviva, the personal guaranty is part of the fraudulent scheme, and PrideCo, as a part of the fraudulent scheme, should be precluded from enforcing the personal guaranty. Viewed in the light most favorable to Ostrem, the facts pled satisfy the requirement they inform PrideCo of the incident giving rise to the claim and inform PrideCo of the claim's general nature. We conclude the allegations made in Ostrem's second count are sufficient to survive a motion to dismiss.

In Ostrem's third count, he alleges that Imperial, David, Kobernusz, and Finance for Life entered into a conspiracy to defraud Aviva into issuing a life insurance policy. Ostrem alleges the defendants made several misrepresentations to him and he relied on those misrepresentations. Ostrem seeks to have the personal guaranty rescinded because it was procured by misrepresentation. Ostrem's petition meets the minimal requirement that it informs PrideCo of the incident or incidents giving rise to the claim and the general nature of the claim. Therefore the facts pled in Ostrem's third count are sufficient to survive a motion to dismiss. Accordingly, we reject PrideCo's assertion that the district court's ruling should be affirmed on alternative grounds.

**IV. Conclusion.**

We conclude a rule that mechanically imputes the jurisdictional contacts of an assignor to its assignee would violate due process. Nevertheless, under the circumstances of this case, we conclude PrideCo's own contacts with Iowa, based on the contractual relationships it chose to assume by assignment from Imperial, are sufficient to subject PrideCo to personal jurisdiction in Iowa. Accordingly, PrideCo did have the required minimum contacts to support the exercise of personal jurisdiction. Further, we do not affirm the district court's ruling on alternative grounds.[4] We reverse and remand for further proceedings.

**REVERSED AND REMANDED.**

---

[4]As noted above, the district court did not rule on Ostrem's motions because the court found it lacked personal jurisdiction. Ostrem did not raise them on appeal. We therefore do not address those motions. *See Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").