IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-110

No. 436A21

Filed 4 November 2022

STATE OF NORTH CAROLINA *ex rel.* JOSHUA H. STEIN, ATTORNEY GENERAL

v.

E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; and BUSINESS ENTITIES 1-10

Appeal as of right directly to the Supreme Court pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion, entered on 9 September 2021 by Judge Michael L. Robinson, Special Superior Court Judge for Complex Business Cases, in Superior Court, Cumberland County, after being designated a mandatory complex business case pursuant to N.C.G.S. § 7A-45(b). Heard in the Supreme Court on 19 September 2022.

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, Daniel S. Hirschman, Senior Deputy Attorney General, and Marc Bernstein, Special Deputy Attorney General; and Kelley Drye & Warren LLP, by David Zalman, pro hac vice, Levi Downing, pro hac vice, Elizabeth N. Krasnow, pro hac vice, Julia Schuurman, pro hac vice, and Lauren H. Shah, pro hac vice, for plaintiff-appellee.*

*Bradley Arant Boult Cummings LLP, by Robert R. Marcus, C. Bailey King, Jr., and Brian M. Rowlson; and Bartlit Beck LLP, by Katherine L.I. Hacker, pro hac vice, and Joshua P. Ackerman, pro hac vice, for defendant-appellants.*

EARLS, Justice.

¶ 1        Individuals and corporate entities have a "liberty interest in not being subject to the binding judgments of a forum with which [they] ha[ve] no meaningful contacts, ties, or relations" *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). That liberty interest is protected by requiring courts—both state and federal—to have personal jurisdiction over a party before subjecting it to legal proceedings. Where personal jurisdiction exists, it follows that individuals or entities had a "fair warning" they might be subject to legal proceedings in that forum. *Id.* In this sense, personal jurisdiction is a shield—not a sword. Though it protects against the threat of litigation in arbitrary jurisdictions, it is not a tool to be weaponized against claimants by enabling defendants to evade accountability for potentially tortious conduct. But according to the State, that is precisely what E.I. DuPont de Nemours and Company ("Old DuPont") sought to do when, facing liability for releasing harmful chemicals into the environment in North Carolina over a period of decades, it underwent a significant corporate reorganization and transferred millions of dollars in assets to out-of-state companies, creating substantial losses for itself. This appeal concerns whether the Due Process Clause allows North Carolina courts to exercise personal jurisdiction over the companies that received those assets, even though they do not have any contacts of their own in this state. We hold that due process indeed allows as much.

# I.   Factual Background

## A. Old DuPont's Use of Per- and Polyfluoroalkyl Substances ("PFAS")

Old DuPont is a chemical company that produces agricultural and other specialty products. In 2020, North Carolina (the State) brought an action against Old DuPont and its corporate successors, including Chemours, New DuPont, and Corteva,[1] alleging that Old DuPont knowingly operated a plant in North Carolina that released harmful chemicals called per- and polyfluoroalkyl substances ("PFAS") into the environment for over forty years.

PFAS are a class of manmade chemicals nicknamed "forever chemicals" because they are resistant to degradation and thus persist in the environment. In the 1950s, Old DuPont began using various kinds of PFAS, such as perfluorooctanoic acid ("PFOA"), at chemical plants around the country.[2] In 1969, Old DuPont purchased the Fayetteville Works plant, located in Fayetteville, North Carolina, and began producing PFAS at that location in the early 1970s.

PFOA, one of the most widely studied PFAS, is highly soluble, meaning it can be freely transported through water and soil. Thus, because it does not degrade, it can cause environmental damage over long distances. PFOA accumulates and

---

[1] The legal names of these entities are The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.

[2] Unless otherwise indicated, throughout this opinion, we rely on the facts as stated in the State's complaint and take them as true for purposes of this motion to dismiss under Rule 12(b)(2).

persists in people and other organisms, and it has been shown to be carcinogenic at very low concentrations.

¶ 5 The State alleges that, as early as 1961, company scientists warned Old DuPont of the risks associated with PFOA. The warnings were based on internal studies concluding that PFOA caused liver damage in rats and dogs. These early studies led company scientists to caution that PFOA should be handled with extreme care and should not come into direct contact with skin. Old DuPont continued to conduct studies about the health effects of PFOA on plant workers throughout the late 1970s and early 1980s, which similarly concluded that the chemical is toxic and causes adverse health effects. The State also alleges that by 1984, Old DuPont was aware of PFOA's lasting environmental effects. The State alleges that, despite knowing of the consequences associated with PFOA, Old DuPont both concealed such knowledge and refused to adopt technologies that would reduce its PFOA output and thus its human and environmental impact. In 2002, Old DuPont's supplier ceased production of PFOA, leading the company to begin producing its own, including at Fayetteville Works. According to the State's brief, by 2006, Fayetteville Works was the only facility in the United States still producing PFOA. Publicly, the company maintained that PFOA did not cause adverse health or environmental consequences.

**B. Old DuPont's Restructuring**

¶ 6　　Since approximately 2000, Old DuPont's liabilities arising from its PFOA use have been mounting around the country, including a $10.25 million fine paid to the EPA stemming from its failure to report the risks associated with PFOA exposure, a class action settlement for over $300 million arising out of its PFOA discharges at a facility in West Virginia, and a settlement in federal multidistrict litigation for approximately $670 million. The State alleges that, recognizing the scope of its liability for contamination caused by its PFAS and PFOA use, Old DuPont chose to restructure its business to limit future liability and protect its remaining assets. The restructuring took form over three stages.

¶ 7　　First, Old DuPont transferred its Performance Chemicals Business, which included its PFOA and other PFAS-related assets, such as Fayetteville Works, to a wholly-owned subsidiary called Chemours.[3] Old DuPont then spun off Chemours as a separate public company, but the State claims that Chemours was intentionally undercapitalized and unable to satisfy Old DuPont's PFAS liabilities. For instance, aside from assuming Old DuPont's PFAS liabilities, Chemours transferred approximately $3.4 billion to Old DuPont as a cash dividend and issued promissory notes with a principal amount totaling $507 million. Following the spinoff, Chemours reported that its assets totaled $6.298 billion, while its liabilities totaled $6.168

---

[3] Chemours is a defendant in this litigation, but it is not an appellant here.

billion. The State alleges that this figure was an underestimate, and had the estimate been accurate, Chemours would have been deemed insolvent at the time of the spinoff. In fact, in an unrelated lawsuit brought by Chemours against Old DuPont, Chemours made a similar argument and contended that Old DuPont intentionally downplayed the extent of its PFAS liability. *See Chemours Co. v. DowDuPont Inc.*, No. 2019-0351-SG, 2020 WL 1527783, at *7 (Del. Ch. Mar. 30, 2020) (unpublished), *aff'd*, 243 A.3d 441 (Del. 2020) (unpublished order). Because Old DuPont knew that Chemours would be unable to satisfy all of Old DuPont's PFAS-related liabilities, the State argues that Old DuPont also knew that it remained responsible for them.

¶ 8        After the Chemours spinoff, the next step in Old DuPont's reorganization plan was a merger with a company called The Dow Chemical Company ("Old Dow"). But, according to the State's brief, instead of completing the merger as originally announced, Old DuPont and Old Dow formed a new holding company called DowDuPont. Old DuPont and Old Dow became subsidiaries of DowDuPont. During this step of the reorganization, DowDuPont executed numerous business segment and product line realignments and divestitures, which reallocated a substantial portion of Old DuPont's assets to DowDuPont.

¶ 9        Finally, during the third stage in the reorganization, the State argues DowDuPont took additional steps to shield its remaining good assets. As part of this reorganization, DowDuPont formed three separate business lines: (1) the Materials

Science Business; (2) the Agriculture Business; and (3) the Specialty Products Business. It then formed two new companies called Dow, Inc. ("New Dow"), which holds Old Dow as a subsidiary, and Corteva, which holds Old DuPont. DowDuPont also renamed itself DuPont de Nemours, Inc ("New DuPont"). The Materials Science Business was transferred to New Dow, the Agriculture Business was transferred to Corteva, and New DuPont retained ownership of the Specialty Products Business. The Business Court found that Old DuPont transferred these business lines for less than their assets' value. The court further found that, since these transfers took place, Old DuPont's value has dropped continuously, at one point falling at least as low as negative $1.125 billion. In 2019, New DuPont spun off Corteva and New Dow as separate public companies. Corteva and New DuPont are the corporate successors that bring this appeal. New Dow is not a party in this litigation.

¶ 10    A Separation and Distribution Agreement ("the Separation Agreement"), dated 1 April 2019, governs the separation of Corteva and New Dow from New DuPont. In June 2019, the parties entered into a Letter Agreement ("the Letter Agreement"), which amended certain provisions in the Separation Agreement.[4] Based on the Separation Agreement, in conjunction with the Letter Agreement, the Business Court

---

[4] Certain terms of these agreements have been filed under seal, and we therefore do not disclose them here.

found that New DuPont agreed to assume all the Specialty Products liabilities and Corteva agreed to assume all the Agriculture Business liabilities.

**C. Defendant's Motion to Dismiss and the Business Court's Order**

In 2020, North Carolina brought an action against Old DuPont, Corteva, New DuPont, and Chemours asserting claims of negligence, trespass, public nuisance, fraud, and fraudulent transfer related to Old DuPont's use of PFAS at Fayetteville Works and its subsequent reorganization to avoid liability. New DuPont and Corteva moved to dismiss the State's action, arguing that the trial court could not exercise personal jurisdiction over them because they are Delaware holding companies that do not conduct business in North Carolina. They assert that they never owned or operated the Fayetteville Works plant, nor have they ever made, sold, distributed, or discharged PFAS. Rather, Corteva and New DuPont assert that they are "just holding companies" that exist only in Delaware. At this stage, Corteva and New DuPont did not, however, contest the State's allegations regarding Old DuPont's fraudulent restructuring.

Relying on a significant body of case law from both state and federal courts, the Business Court held that the Due Process Clause permits jurisdiction to be exercised over a corporate successor when (1) the predecessor is subject to jurisdiction in the forum; and (2) state law subjects the successor to liability. Recognizing that the first requirement was easily established given Old DuPont's history in North

Carolina, the Business Court focused on the second factor and identified the extent to which North Carolina law imputes the liabilities of a predecessor to its successors. Citing a previous Court of Appeals decision, the Business Court first explained that "[a] corporation which purchases all, or substantially all, of the assets of another corporation is generally not liable for the old corporation's debts or liabilities." *State ex rel. Stein v. E.I. du Pont de Nemours & Co.*, No. 20 CVS 5612, 2021 WL 4127106, at *6, 2021 NCBC 54, ¶ 44 (N.C. Super. Ct. Cumberland County (Bus. Ct.) Sept. 9, 2021) (unpublished) (alteration in original) (quoting *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687 (1988)). But in *Budd Tire*, the Court of Appeals recognized four exceptions to this principle—two of which the Business Court found to be relevant here. The first exception the Business Court applied imputes the liabilities of a predecessor to its successor when "there is an express or implied agreement by the purchasing corporation to assume the debt or liability." *Budd Tire*, 90 N.C. App. at 687. The second exception imputes liability to the successor when "the transfer of assets was done for the purpose of defrauding the corporation's creditors." *Id.*

¶ 13     In its opposition to the motion to dismiss, the State argued that, as an alternative ground for jurisdiction, defendants' allegedly fraudulent conduct was aimed at North Carolina and justified exercising direct jurisdiction over Corteva and New DuPont under the Supreme Court's decision in *Calder v. Jones*. 465 U.S. 783 (1984). In *Calder*, the Court held that courts may exercise jurisdiction over

defendants who commit "intentional, and allegedly tortious, actions" outside the forum that "were expressly aimed at" the forum. *Id.* at 789. Exercising *Calder* jurisdiction would obviate the need to conduct the imputation analysis to determine whether personal jurisdiction is proper under North Carolina law. The Business Court declined to address this argument, however, finding it an unnecessary step because jurisdiction was established by imputing Old DuPont's liabilities to Corteva and New DuPont.

## II. Analysis

There are two questions on appeal. The first is whether the Due Process Clause permits personal jurisdiction over out-of-state corporate successors to be based on the contacts of their in-state predecessor company by imputing the conduct and liabilities of the predecessor to its successors. Second, the State asks this Court to determine whether Old DuPont's allegedly fraudulent conduct was expressly aimed at North Carolina, justifying the exercise of direct jurisdiction pursuant to the United States Supreme Court's decision in *Calder v. Jones*.

### A. Personal Jurisdiction

When the parties have submitted affidavits and other documentary evidence, a trial court reviewing a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) must determine whether the plaintiff has established that jurisdiction exists by a preponderance of the evidence. *See Bauer v. Douglas Aquatics, Inc.*, 207 N.C.

App. 65, 68 (2010). The documentary evidence may include "any allegations in the complaint that are not controverted by the defendant's affidavit." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.,* 169 N.C. App. 690, 693-94 (2005) (quoting *Bruggeman v. Meditrust Acquisition Co.,* 138 N.C. App. 612, 615-16 (2000) (citations omitted)). As an appellate court, we consider whether the trial court's determination regarding personal jurisdiction is supported by competent evidence in the record. *Toshiba Glob. Com. Sols., Inc. v. Smart & Final Stores LLC*, 2381 N.C. 692, 2022-NCSC-81, ¶ 8 (2022) ("[W]hether personal jurisdiction exists is a question of fact and . . . appellate courts . . . assess whether the determination is supported by competent evidence in the record"). "However, when the pertinent inquiry on appeal is based on a question of law[,] we conduct de novo review." *Id.* (citing *Da Silva v. WakeMed*, 375 N.C. 1, 5 (2020)).

¶ 16    Determining whether a nonresident defendant is subject to personal jurisdiction in this State's courts involves a two-step analysis. *Beem USA Ltd.-Liab. Ltd. P'shp v. Grax Consulting LLC*, 373 N.C. 297, 302 (2020). "First, jurisdiction over the defendant must be authorized by N.C.G.S. § 1-75.4—North Carolina's long-arm statute." *Id.* Relevant here, § 1-75.4 states that personal jurisdiction exists where a party "[i]s engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise." N.C.G.S. § 1-75.4(1)(d) (2021). This statute is "intended to make available to the North Carolina courts the full

jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676 (1977). Therefore, in this case, the statutory analysis merges with the due process analysis.

¶ 17      Second, "if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Beem USA*, 373 N.C. at 302 (quoting *Skinner v. Preferred Credit*, 361 N.C. 114, 119 (2006)). Exercising jurisdiction over an out-of-state defendant comports with the Due Process Clause when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted)). Minimum contacts, in turn, result from 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 303 (quoting *Skinner*, 361 N.C. at 133).

¶ 18      There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). General jurisdiction exists when the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe,*

326 U.S. at 317). Specific jurisdiction, however, exists only when "the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127 (alterations in original) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). The parties here agree that Corteva and New DuPont are not subject to general jurisdiction. The question then is whether these out-of-state successors of Old DuPont can be subject to specific jurisdiction in North Carolina courts based on Old DuPont's conduct and liabilities in the State.

¶ 19 "'The great weight of persuasive authority permits imputation of a predecessor's actions upon its successor *whenever* forum law would hold the successor liable for its predecessor's actions.'"[5] *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990) (quoting *Simmers v. Am. Cyanamid Corp.,* 576 A.2d

---

[5] *See, e.g.*, *Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 227 (4th Cir. 2019) ("[W]here one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation."); *Perry Drug Stores v. CSK Auto Corp.*, 93 F. App'x 677, 681 (6th Cir. 2003) (opining that "[a] court may impute the jurisdictional contacts of a corporate predecessor to its successor where the successor expressly assumed the liability of the predecessor" and explaining that "a contrary result would allow corporations to 'immunize themselves by formalistically changing their titles'") (quoting *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982), *aff'd sub nom, Pallas Shipping Agency, Ltd. V. Duris*, 461 U.S. 529 (1983)); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."); *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644, 654-55 (Mich. 1995) ("We hold that the actions of a constituent corporation may be attributed to a surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities allegedly incurred by the constituent corporation . . . [W]e find the rule equally applicable when a corporation expressly assumes the liabilities of its predecessors.").

376, 385 (Pa. Super. Ct. 1990) (emphasis in original); *see also Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (explaining that "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor" of an entity that is subject to jurisdiction there).

"The theory underlying these cases is that, because the two corporations . . . are the *same entity,* the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis." *Patin*, 294 F.3d at 653. Further, as the Business Court acknowledged, declining to impute contacts for jurisdictional purposes in all cases would enable corporations to "avoid all consequences . . . by just reforming in some other jurisdiction[.]" *Madison Mgmt. Grp.*, 918 F.2d at 455; *see also E.I. du Pont de Nemours*, 2021 WL 4127106, at \*6, 2021 NCBC 54, ¶ 43.

Cases from other jurisdictions reaching the same conclusion are instructive. In *Simmers v. American Cyanamid Corp.*, for example, a Pennsylvania court held that a company not otherwise operating in the state that purchased a product line from a second in-state company and expressly assumed the second company's related liabilities could be subject to personal jurisdiction in Pennsylvania. *See Simmers*, 576

A.2d at 387. In so holding, the court "recognize[d] the realities of modern corporate law and the ever increasing frequency of corporate reorganizations." *Id.* at 389. It reasoned that refusing to impute a predecessor's liabilities to its successor would allow the successor to "avoid the jurisdiction of the very forum where the liability accrued simply because it never did business within that forum." *Id.* at 390. The court explained that this would be an "absurd" result, particularly when "the assets purchased by the successor, at least in part, were derived from the forum and the successor no doubt had knowledge of its predecessor's presence within the forum." *Id.* We find this reasoning persuasive and hold that due process permits courts to exercise successor jurisdiction whenever (1) the predecessor is subject to personal jurisdiction in a particular forum; and (2) that forum's law permits courts to impute the liabilities of the predecessor to its successors.[6] Because neither party disputes that Old DuPont is subject to jurisdiction in North Carolina, this appeal focuses on the second factor.

It is true that, in North Carolina, "[a] corporation which purchases all, or substantially all, of the assets of another corporation is generally not liable for the old corporation's debts or liabilities." *Budd Tire*, 90 N.C. App. at 687; *see also McAlister v. Am. Ry. Express Co.* 179 N.C. 556, 561 (1920) ("As a general rule [ ] the

---

[6] As explained below, forum law dictates the extent to which imputation to establish both liability and jurisdiction is permissible. The predecessor company's liability alone is not enough to establish successor jurisdiction.

mere purchase of the assets and franchise[s] of one corporation by another will not imply a promise on the part of the new to pay or satisfy the debts and obligations of the old.") (quoting 5 Seymour D. Thompson, *Commentaries on the Law of Corporations* § 6090 (2d Ed.)). But there are several exceptions to this principle, which the Court of Appeals encapsulated in *Budd Tire*, where:

> (1) there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) the transfer amounts to a de facto merger of the two corporations; (3) the transfer of assets was done for the purpose of defrauding the corporation's creditors, or; (4) the purchasing corporation is a "mere continuation" of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers.

*Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. at 687 (citations omitted); *see also McAlister*, 179 N.C. at 560. If any one of these circumstances is present, North Carolina law permits a predecessor company's liabilities to be imputed to its corporate successors, making jurisdiction over out-of-state successors proper under the Due Process Clause.[7]

Importantly, exercising jurisdiction over out-of-state successors in these circumstances does not offend "our traditional conception of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 324. Where any of these conditions exist, it cannot be

---

[7] We clarify, however, that this list is not exhaustive. Additional circumstances may arise that warrant expanding these limitations. Such circumstances are not before us now, and we need not decide what they might be.

said that a successor's contacts are "random, fortuitous, or attenuated." *See Burger King*, 471 U.S. at 475 (cleaned up). Rather, in these situations, a successor likely has or should have notice of the liabilities of its predecessor in a given jurisdiction.

¶ 24          The court in *Simmers* put it well. In holding that due process permits jurisdiction to be established by imputing a predecessor company's contacts to its out-of-state successors, the court explained, "[n]o doubt in today's sophisticated world of corporate takeovers, a corporation, which assumes another's liabilities . . . seriously considers the possible extent of any liabilities and where those liabilities may exist." *Simmers*, 576 A.2d at 3. Here, for instance, the Business Court found that both Corteva and New DuPont expressly assumed Old DuPont's PFAS-related liabilities via the April 2019 Separation Agreement and the June 2019 Letter Agreement. And "[w]hen a successor corporation assumes the liabilities of its corporate predecessors, the successor in effect consents to be held liable in the same locations where its predecessor would have been exposed." *Id*. By assuming the liabilities of Old DuPont, Corteva and New DuPont's "conduct and connection with the forum State are such that [they] should reasonably anticipate being haled into court" in North Carolina. *See Burger King*, 471 U.S. at 474 (quoting *Worldwide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

¶ 25          Corteva and New DuPont argue that imputing Old DuPont's contacts to establish personal jurisdiction is inappropriate because they are not the corporate

continuations or embodiments of Old DuPont, which continues to exist as its own entity. They argue that the cases that allow personal jurisdiction to be established for out-of-state successors through imputation have involved actual or de facto mergers. *See, e.g., Synergy Ins. Co. v. Unique Pers. Consultants, Inc.*, No. 3:16CV611, 2017 WL 5474058, at *2 (W.D.N.C. Nov. 14, 2017) (unpublished order) (finding that an entity was a corporate successor when, among other things, it purchased all assets and took over the headquarters, satellite branches, phone numbers, and website content of its predecessor); *Simmers*, 576 A.2d at 386–88 (imputing predecessors' contacts to establish jurisdiction over corporate successors after de facto mergers).[8]

We decline to recognize mergers as the sole circumstance in which successor jurisdiction is appropriate. Such a holding would result in the very consequence described above: Companies could avoid liability for tortious conduct simply by forming a new, out-of-state company instead of effectuating a merger. Moreover, where, as here, a company has explicitly assumed certain liabilities or reorganized to

---

[8] Instead, Corteva and New DuPont argue they should be treated as assignees and point out that "[t]he expectations of a corporate successor and an assignee are different." *See Ostrem v. Prideco Secure Loan Fund, LP,* 841 N.W.2d 882, 895 (Iowa 2014). Citing the Iowa Supreme Court's opinion in *Ostrem*, they argue that unlike a successor, "an assignee . . . assumes a limited bundle of rights, obligations, and expectations." *Id.* Corteva and New DuPont contend that they assumed only limited assets and corresponding liabilities from Old DuPont and should thus be treated as assignees. This argument fails, however, because it ignores the other circumstances in which successor jurisdiction is appropriate—circumstances that we hold exist here. But even if we were to treat Corteva and New DuPont as assignees, the "limited bundle of . . . obligations," *id.*, they assumed include the liabilities that are the subject of this litigation.

avoid the very liability for which it is brought to court, requiring a merger or a corporate continuation to establish successor jurisdiction would serve no additional purpose.

¶ 27 Recognizing successor liability and jurisdiction in these narrow circumstances ensures that a company that merely receives assets from another entity does not, without more, become saddled with all of the transferor's debts and liabilities. *See Madison Mgmt. Grp.*, 918 F.2d at 450. But a company may take certain affirmative steps that justify both the imputation of those liabilities and the exercise of jurisdiction. Actual and de facto mergers are one such example, in part because the merging companies know in advance that they will become responsible for each other's liabilities, and they thus weigh the associated risks.[9] Assuming certain liabilities or intentionally reorganizing to avoid them similarly requires a party to weigh the risks at hand and affirmatively decide whether to become legally responsible for them or, as alleged here, attempt to fraudulently evade them. When a party has engaged in such conduct, successor jurisdiction is equally appropriate.

[9] *See, e.g., McAlister v. Am. Ry. Express Co.*, 179 N.C. at 564 ("Where two corporations effect a consolidation (or merger), and one of them goes entirely out of existence, and no arrangements are made respecting its liabilities, the resulting consolidated (or merged), corporation will, as a general rule, be entitled to all the property and answerable for all the liabilities of the corporation thus absorbed." (quoting *Atlanta, B. & A.R. Co. v. Atl. Coast Line R.R. Co.*, 75 S.E. 468, 470 (1912) (parentheticals added))).

Thus, like many other courts that have decided this question, we are satisfied that due process permits jurisdiction to be exercised over out-of-state corporate successors where there is jurisdiction over the predecessor and North Carolina law would impute the predecessor's liability to its successors.

¶ 28    Here, the Business Court found that North Carolina law permits liability to be imputed to Corteva and New DuPont, thereby creating personal jurisdiction over the companies, because: (1) the parties expressly agreed to assume Old DuPont's liabilities in the April 2019 Separation Agreement and the June 2019 Letter Agreement; and (2) the State alleged sufficient facts at the motion to dismiss stage to support the claim that Old DuPont transferred its assets to Corteva and New DuPont in an attempt to defraud the State in its position as a creditor.

¶ 29    As to the first exception, the Business Court made detailed findings of fact regarding the meaning of the April 2019 Separation Agreement and the June 2019 Letter Agreement. Key to this analysis, the court pointed to plain contractual language stating that Corteva and New DuPont expressly assumed Old DuPont's PFAS-related liabilities. *E.I. du Pont de Nemours*, 2021 WL 4127106, at *7, 2021 NCBC 54, ¶ 48. The Business Court found that "[i]t is clear that by execution of the DowDuPont Separation Agreement and the Letter Agreement, Corteva and New DuPont assumed certain liabilities related to Old DuPont's manufacturing of PFAS." *Id.* at *8, 2021 NCBC 54, ¶ 51. The court rejected Corteva and New DuPont's

argument that Chemours exclusively assumed all of the PFAS liabilities when it was spun off as a separate company because "Chemours' assumption of PFAS liabilities as a legal matter does not preclude Corteva and New DuPont from assuming those same PFAS liabilities and [Corteva and New DuPont] do not cite any authority supporting this position." *Id.* at *8, 2021 NCBC 54, ¶ 53. The court also rejected the argument that Corteva and New DuPont agreed to indemnify each other for PFAS-related losses but did not assume such liabilities. *Id.* at *8, 2021 NCBC 54, ¶ 53. The court found that the relevant term within the Separation Agreement was sufficiently broad to permit "the interpretation that Corteva and New DuPont not only agreed to indemnify against certain liabilities but additionally assume the same liabilities."[10] *Id.* at *8, 2021 NCBC 54, ¶ 53.

¶ 30   On appeal, Corteva and New DuPont argue that the language of these Agreements is merely "the starting point of the analysis," and the Business Court

---

[10] Section 1.1(144) of the April 2019 Separation Agreement defines "Indemnifiable Loss" and "Indemnifiable Losses" as:

> any and all Damages, losses, deficiencies, Liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs, and expenses (including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements, and compromises relating thereto and the reasonable costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereof or the enforcement of rights hereunder).

should have gone on to "evaluate whether those assumptions of liability were such that Corteva and New DuPont reasonably could have expected to be subject to jurisdiction in North Carolina." They contend that the answer to this question is no, in part because, through those Agreements, "Corteva, New DuPont, and Dow were allocating liabilities amongst themselves against the backdrop of Historic DuPont's previous divestiture of its PFAS business to Chemours." Corteva and New DuPont do not, however, respond to the Business Court's decision that Chemours' assumption of the PFAS liabilities did not preclude them from assuming these liabilities as well. Furthermore, nothing in the record suggests that Chemours validly assumed all PFAS-related liabilities to the exclusion of all parties that would otherwise be liable. Corteva and New DuPont's assertion on this point is therefore unconvincing.

¶ 31        Corteva and New DuPont also argue that assuming liability through the Agreements was insufficient to put them on notice that they may be subject to jurisdiction in North Carolina because those liability provisions pertain to Old DuPont's operations broadly, without specifying *where* they would be liable. This argument, too, is unavailing. A company cannot expressly assume liabilities from its predecessor, fail to limit those liabilities geographically, and then disclaim liability based on the notion that it did not expect to be brought to court in a particular forum. Such a holding would nullify the relevant provisions entirely because the lack of geographic specificity would mean that there is *no* jurisdiction in which Corteva and

New DuPont expected to be held liable. Moreover, to reiterate what we have already explained, when companies undergo complicated transactions like that between Old DuPont, Corteva, and New DuPont, they conduct extensive due diligence, and the new parties either are aware of, or should be aware of, the liabilities they might acquire. Old DuPont's PFAS liabilities were no secret—before the corporate reorganization, it had already paid millions in well-publicized fines and settlements. Corteva and New DuPont had ample notice then that they might become liable in any venue where Old DuPont acquired PFAS liability.

¶ 32         In sum, the Business Court's interpretation of the plain language of the Agreements is well supported, and we uphold its finding that Corteva and New DuPont expressly assumed Old DuPont's PFAS liabilities, including those liabilities arising in North Carolina.

¶ 33         The Business Court also found that Old DuPont's PFAS liabilities could be imputed to its successors because the State sufficiently alleged that Old DuPont fraudulently engaged in the reorganization transactions that created Corteva and New DuPont to prevent the State and other creditors from holding the company liable to the full extent. The State alleged that "these transactions have resulted in (1) Old DuPont having a negative net worth; (2) Chemours being undercapitalized and unable to satisfy Old DuPont's PFAS liabilities; and (3) the transfer of valuable assets from Old DuPont to Corteva and New DuPont for far less consideration than those

assets were worth." *Id.* at *9, 2021 NCBC 54, ¶ 57. Relying on the same evidence that was before the Business Court, this Court finds that the complaint alleged sufficient facts from which to conclude that Old DuPont engaged in a corporate reorganization to defraud its creditors. For example, the State alleges that, as part of its plan to insulate its assets, Old DuPont spun off Chemours, its wholly owned subsidiary. As part of the spinoff, Chemours agreed to accept all of Old DuPont's PFAS liabilities, transferred to Old DuPont approximately $3.4 billion as a cash dividend, and issued promissory notes with a principal amount of $507 million. The State then alleges that, knowing Chemours would be unable to satisfy the full extent of its PFAS liabilities, Old DuPont proceeded with the series of transactions that eventually created New DuPont, Corteva and New Dow. After the corporate reorganization was complete, the value of Old DuPont's tangible assets had decreased by $20.85 billion. As the State points out, this loss came at a time when Old DuPont knew it faced potentially billions of dollars in liability.

¶ 34    These examples support the State's theory that Old DuPont engaged in the corporate reorganization to fraudulently deprive its creditors of judicial recourse. The State's allegations are extensive, and we hold that they are sufficient to support the Business Court's conclusion that, at this stage of the proceedings, the State has adequately pleaded that Corteva and New DuPont acted fraudulently. Thus, there is a second, independent ground upon which to hold the successors liable for Old

DuPont's debts and liabilities and therefore, to find jurisdiction over Corteva and New DuPont in this state.[11]

**B. *Calder* Jurisdiction**

¶ 35      The State asserts an alternative ground for jurisdiction under the U.S. Supreme Court's decision in *Calder v. Jones*. In *Calder*, the Court held that it may be appropriate for a court to exercise jurisdiction over a defendant who commits "intentional, and allegedly tortious, actions" outside the forum that "were expressly aimed at" the forum. 465 U.S. at 789. *Calder* involved an allegedly libelous story that was written and edited in Florida about events that occurred in California and concerned a California resident. *Id.* at 784–86. The story's sources were from California and the alleged harm was suffered in California. *Id.* In holding that the authors of the story could be sued in California, the Supreme Court opined that it was foreseeable that the effects of the story would be felt in California, and that "[a]n

---

[11] Courts in other jurisdictions presiding over litigation related to Old DuPont's use of PFAS have reached similar conclusions. *See, e.g., State of New Hampshire v. 3M Company*, No. 216-2019-CV-0045 (Sup. Ct., Merrimack Co. July 8, 2021) (unpublished) (holding that New Hampshire law permits imputation of a predecessor corporation's contacts to establish successor jurisdiction and finding that the State made a prima facie showing that jurisdiction existed over Corteva and New DuPont based on (1) their express assumption of Old DuPont's PFAS liabilities; and (2) their fraudulent efforts to help Old DuPont evade liability); *State of Ohio ex rel. DeWine v. E.I. du Pont de Nemours and Co.*, No. 180T32 (Ct. Common Pleas, Wash. Co. Aug. 4, 2021) (unpublished) (denying Corteva and New DuPont's motion to dismiss for lack of jurisdiction and granting the State's cross-motion regarding their assumption of Old DuPont's liabilities); *Suez Water New Jersey, Inc. v. E.I. DuPont de Nemours, et al.*, No. 2:20-CV-19906 (D.N.J. Oct. 14, 2021) ("If Corteva and New DuPont expressly assumed some PFAS-related liability from Old DuPont's activities in New Jersey, this would provide minimum contacts with the forum state sufficient to support personal jurisdiction.").

individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California. *Id.* at 790.

¶ 36        The Business Court declined to decide whether jurisdiction here was proper under *Calder* because it found that personal jurisdiction could be established through the imputation analysis alone. Still, the State argues that this Court should determine whether *Calder* applies because, if so, the Business Court could exercise direct jurisdiction over the defendants for all fraud claims without needing to revisit the imputation analysis to determine whether personal jurisdiction exists after the pleadings stage. We conclude that determining whether *Calder* jurisdiction exists is unnecessary under these circumstances. Our rulings here establish that North Carolina courts have personal jurisdiction over Corteva and New DuPont. Even if, after the motion to dismiss stage, the Business Court determines that Corteva and New DuPont did not attempt to defraud creditors for purposes of the third *Budd Tire* exception for imputing liability, jurisdiction is conclusively established under *Budd Tire's* other relevant exception—that Corteva and New DuPont expressly assumed Old Dupont's PFAS-related liabilities. The parties do not dispute that Old DuPont is subject to specific jurisdiction in North Carolina based on its PFAS-related liabilities. Thus, the Business Court has jurisdiction over Corteva and New DuPont for all of the

State's claims arising out of and related to Old DuPont's PFAS-related activities in North Carolina.

### III.   Conclusion

¶ 37        We follow the "great weight of persuasive authority," *Madison Mgmt. Grp.*, 918 F.2d at 454, and hold that the Due Process Clause permits a predecessor's liabilities to be imputed to its corporate successors to establish personal jurisdiction even where the successor itself has no direct contact with the forum state. Successor liability comports with both due process and North Carolina law at least where (1) a party assumes another entity's debts or liabilities through an express or implied agreement; (2) the transfer constitutes an actual or de facto merger of corporations; (3) a transfer of assets occurred for the purpose of defrauding the corporation's creditors; or (4) the purchasing corporation is a continuation of the selling corporation because it has the same shareholders, directors, and officers.

¶ 38        Because personal jurisdiction can be established through the imputation analysis for all of the State's claims arising out of or related to Old DuPont's PFAS-related activities in North Carolina, we need not determine whether *Calder* would permit the Business Court to exercise direct jurisdiction.

¶ 39        Accordingly, we affirm the decision of the Business Court denying Corteva and New DuPont's motion to dismiss under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure and remand this case to that court for additional proceedings not

inconsistent with this opinion.

AFFIRMED.